**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN ARMSTRONG; JAMES AMAURIC;
RICHARD PONCIANO; JACK SWENSEN;
BILLY BECK; JUDY FENDT; WALTER
FRATUS; GREGORY SANDOVAL;
DARLENE MADISON; PETER
RICHARDSON; STEVEN HILL; DAVID
ROSE; DAVID BLESSING; ELIO
CASTRO; ELMER UMBENHOWER;
RAYMOND HAYES; GENE HORROCKS;
KIAH MINCEY; CLIFTON FEATHERS;
WILLIE JOHNSON; DAVID BADILLO;
JAMES SIMMONS; FLORA ABRAMS;
JOEY GOUGH; TIMOTHY WHISMAN,
       *Plaintiffs-Appellees,*

      v.

ARNOLD SCHWARZENEGGER;
MATTHEW CATE; BERNARD WARNER;
SHARON AUGUST; DEBORAH HYSEN;
SUZAN HUBBARD; ROBERT
AMBROSELLI,
       *Defendants-Appellants.*

No. 09-17144

D.C. No.
4:94-cv-02307-CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia A. Wilken, District Judge, Presiding

Argued and Submitted
January 28, 2010—Pasadena, California

Filed September 7, 2010

Before: Stephen Reinhardt, A. Wallace Tashima and
Marsha S. Berzon, Circuit Judges.

13469

Opinion by Judge Reinhardt

**COUNSEL**

Michael W. Bien, Ernest Galvan, Gay C. Grunfeld, Blake Thompson, Warren E. George, San Francisco, California, and Donald Specter, Sara Norman, Linda Kilb, Berkeley, California, for the plaintiffs-appellees.

Edmund G. Brown Jr., Attorney General of the State of California; Jonathan L. Wolff, Senior Assistant Attorney General; Jay C. Russell, Supervising Deputy Attorney General; Scott J. Feudale, Deputy Attorney General, San Francisco, California, for the defendants-appellants.

Thomas E. Perez, Assistant Attorney General of the United States, Samuel Bagenstos, Deputy Assistant Attorney General, Mark L. Gross, Attorney, Civil Rights Division of the

Department of Justice, Conor B. Dugan, Attorney, Civil Rights Division of the Department of Justice, Washington, D.C., for amicus curiae the United States.

**OPINION**

REINHARDT, Circuit Judge:

More than a decade and a half ago, disabled prisoners and parolees brought this action against the California officials with responsibility over the corrections system and parole proceedings. They sought accommodations to their disabilities that are required by the Americans with Disabilities Act, the Rehabilitation Act, and the Constitution. Defendants denied that they had any obligation to provide such accommodations, forcing plaintiffs to undertake years of litigation. Plaintiffs prevailed repeatedly in the district court and in this court. For most of the last decade, the litigation has been in a remedial phase.

Now, however, defendants are again denying any obligation to accommodate a set of disabled prisoners and parolees held under California's authority. Defendants house significant numbers of prisoners and parolees in jails operated by California's fifty-eight counties. Defendants contend that they have no responsibility for ensuring that any disabled prisoners and parolees that they so house receive accommodations. Their primary contention is that the regulations implementing the ADA, which make explicit that an entity cannot avoid its ADA obligations by operating "through contractual, licensing, or other arrangements" with third parties, 28 C.F.R. § 35.130(b)(1), are "manifestly contrary to the" ADA. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). That argument, and defendants' other arguments contesting their obligations to their prisoners and parolees housed in county jails, are without merit. Accord-

ingly, we affirm the portion of the district court's decision that holds that defendants are responsible for providing reasonable accommodations to the disabled prisoners and parolees that they house in county jails.

We also hold that the district court made the findings required by the Prison Litigation Reform Act regarding the necessity for relief and the narrowness and lack of intrusiveness of the relief order. We cannot affirm the precise relief ordered by the district court, however, because plaintiffs adduced insufficient evidence to justify such relief. Accordingly, we vacate and remand to the district court for further proceedings, including the introduction of additional evidence by the parties. The district court shall facilitate the parties' efforts, in particular the plaintiffs', to obtain evidence relevant to the resolution of this question.

# I

In 1994, plaintiffs, a class of all present and future California state prison inmates and parolees with certain disabilities, sued defendants, California state officials with responsibility for the operation of the Department of Corrections and Rehabilitation (the "CDCR") and the Board of Parole Hearings ("BPH"), challenging the State's treatment of disabled prisoners and parolees. A series of decisions by the district court and this court established that the Americans with Disabilities Act ( "ADA"), 42 U.S.C. §§ 12131-34, and the Rehabiliation Act ("RA"), 29 U.S.C. § 794, applied to state prisoners, and that defendants' policies and procedures with regard to disabled prisoners and parolees were inadequate and violative of the ADA, the RA, and the Due Process Clause of the Constitution. *See Armstrong v. Davis*, 318 F.3d 965, 968-69 (9th Cir. 2003); *Armstrong v. Davis*, 275 F.3d 849, 854-58 (9th Cir. 2001); *Armstrong v. Wilson*, 124 F.3d 1019, 1020-21 (9th Cir. 1997); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998). Pursuant to court orders, the CDCR defendants produced a remedial plan in January of 2001, and in March 2001,

the district court entered a permanent injunction directing enforcement of that plan. *See Armstrong v. Davis*, 58 F. App'x. 695 (9th Cir. 2003). The district court entered a comparable permanent injunction with respect to the BPH defendants in 1999 and a revised permanent injunction in 2002. *See Armstrong*, 275 F.3d at 858.

Since the issuance of those injunctions and the decisions by this court affirming them, the litigation has been in a remedial phase, with defendants evaluating and modifying their procedures and policies and plaintiffs monitoring defendants' compliance with the injunctions and the remedial plan and at times seeking enforcement through the district court. Recent developments in the litigation have focused on such issues as defendants' obligation to create and implement a computerized system for tracking prisoners and parolees with disabilities in order to ensure that necessary accommodations are provided as prisoners and parolees move through the system. *See Armstrong v. Schwarzenegger*, No. 4:94-cv-02307 (N.D. Cal. May 30, 2006) (order granting motion to enforce revised permanent injunction); *Armstrong v. Schwarzenegger*, No. 4:94-cv-02307 (N.D. Cal. Sept. 11, 2007) (order granting in part plaintiffs' motion to enforce the May 30, 2006 order).

At issue in the current appeal is plaintiffs' May 28, 2009 motion to require defendants to track and accommodate the needs of class members housed in county jails and to ensure a workable grievance procedure for such class members. Pursuant to both contracts with the counties and its statutory authority under Cal. Penal Code § 4016.5, the State houses prisoners and parolees in county jails in a variety of circumstances, including, for example: for the period between a parole hold being placed on an individual and the individual's parole revocation hearing; for the full term of parole subsequent to parole being revoked; and for in-custody drug treatment programs. In the aggregate, these policies lead to significant numbers of persons incarcerated pursuant to the State's authority being housed in county jails; for instance, the

San Mateo County Jail houses an average of 480 parolees a day, and Alameda and Sacramento County jails each house an average of 1000 parolees a day. In addition to these current placements, we take judicial notice of the State's recent proposal to alter its sentencing practices to place in county jails approximately 14,000 persons who would otherwise be incarcerated in prisons. *See* Defendants' Response to Three Judge Court's October 21, 2009 Order*, Coleman v. Schwarzenegger*, Nov. 12, 2009, No. 2:90-cv-00520, (C.D. Cal Nov 12, 2009), ex. A.

In their motion, plaintiffs sought an "order requiring Defendants to develop and implement effective policies and procedures ensuring all prisoners and parolees with mobility, vision, hearing, developmental, kidney, and learning disabilities housed in county jails receive the accommodations they need." Defendants replied by denying any responsibility towards such prisoners and parolees. On September 16, 2009, the district court issued an order granting plaintiffs' motion. It found that defendants were violating the ADA, the RA and the court's prior orders by failing to provide disability accommodations for disabled class members housed in county jails. It ordered defendants to develop and issue to the counties a plan to comply with the ADA by improving the tracking of state prisoners and parolees they house in county jails, notifying jails when the state sends the county a class member with a disability, and ensuring that class members housed in the jails have access to an adequate ADA grievance procedure. The court ordered that "at a minimum" several specific provisions regarding the timing of tracking, and response to notice of disabilities and class members' grievances be included in the plan. Defendants timely appealed.

## II

As a preliminary matter, plaintiffs challenge our jurisdiction over this appeal. We have "jurisdiction of appeals from all final decisions of the district courts of the United States."

28 U.S.C. § 1291. Plaintiffs contend that the district court's order was insufficiently final to invest us with jurisdiction. "Under modern doctrine, '[a] "final decision" generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment . . . .' " *United States v. One 1986 Ford Pickup*, 56 F.3d 1181, 1184 (9th Cir. 1995). Finality is "to be given a practical rather than a technical construction": the finality requirement is intended to prevent "piecemeal litigation" rather than to vindicate some purely technical definition of finality. *Id.* Notably, some cases involve more than one final decision. *See id.* at 1185. In particular, appeals courts have jurisdiction over post-judgment orders, such as a district court might enter pursuant to the jurisdiction it has retained to enforce a prior order. This court has declared itself less concerned with piecemeal review when considering post-judgment orders, and more concerned with allowing some opportunity for review, because "unless such [post-judgment] orders are found final, there is often little prospect that further proceedings will occur to make them final." *See id.*

**[1]** The order here at issue required defendants to produce a plan with specific features that would be disseminated to the counties and that would govern future interactions between defendants, the counties, and the disabled prisoners and parolees housed in the county jails. It did not contemplate further orders except in the event of disagreement between defendants and plaintiffs over the details of the plan. If we did not exercise jurisdiction here and the defendants in good faith delivered the plan as ordered, it is unclear that there would be any future opportunity for them to appeal. Accordingly, jurisdiction lies.

Plaintiffs' argument to the contrary is not convincing. They cite *Balla v. Idaho State Board of Corrections*, 869 F.2d 461 (9th Cir. 1989), for the proposition that "court orders which require the submission of detailed plans are not final orders." *Id.* at 464-65; *but cf. Armstrong I*, 124 F.3d at 1022 (explain-

ing that appellate jurisdiction under 28 U.S.C. § 1292 exists over an order requiring submission of a plan so long as delaying the appeal until after the delivery of the plan "would not clarify the questions on appeal," and the "exact specifications of the plan would not alter in a material manner the issues that would be presented to the court of appeals"); *United States v. Alabama*, 828 F.2d 1532, 1536-38 (11th Cir. 1987) (finding appealable under § 1291 an order to submit a plan where the order was "specific[ ], detail[ed], and comprehensive[ ]" in describing the requirements of the plan). The order at issue in this case, however, required more of defendants than the simple "submission" of a detailed plan present in *Balla*. In particular, the order at issue in *Balla* required the defendants in that case to generate a plan that adhered to a set of "skeletal" requirements and that would not be implemented until after the district court had evaluated it, and, by separate order, required the defendants to adopt it. *See Balla*, 869 F.2d at 463-64. The order at issue in the instant case required defendants not simply to submit a plan that would be put into effect by a subsequent order, but to develop a plan and implement it. Jurisdiction for the order discussed in *Balla* would have been premature because nothing yet had been required of defendants, other than to put effort into developing constructive solutions to their violations of federal law, which is a step that courts can reasonably require defendants to take in order to aid them in structuring relief that is narrow and minimally intrusive. In contrast, here it is possible that no further proceedings would take place before defendants were required to implement the plan that they seek to contest.

## III

**[2]** One of the bases relied upon by the district court in determining that defendants are responsible for ensuring that class members housed in county jails receive the accommodations required by the ADA was a regulation implementing Title II of that Act. The regulation states, "a public entity, in providing any aid, benefit, or service, may not, directly or

through contractual, licensing, or other arrangements, discriminate against individuals with disabilities." 28 C.F.R. § 35.130(b)(1). This regulation was promulgated by the Attorney General pursuant to Congress's direction that he promulgate regulations implementing Title II that are consistent with the regulations governing Section 504 of the Rehabilitation Act. *See* 42 U.S.C. § 12134. In accordance with the deference principles outlined in *Chevron*, 467 U.S. at 844, "Department of Justice regulations interpreting Title II should be given controlling weight unless they are 'arbitrary, capricious, or manifestly contrary to the statute.' " *McGary v. City of Portland*, 386 F.3d 1259, 1269 n. 6 (9th Cir. 2004) (quoting *Chevron*, 467 U.S. at 844).

**[3]** A bare reading of Title II does not suggest any reason to conclude that the Attorney General's interpretation of the provision is arbitrary, capricious, or manifestly contrary to the text of the statute. There is nothing in Title II's brief and general statement that public entities may not discriminate against disabled persons when providing services, programs and activities that suggests that the Attorney General was incorrect in concluding that "the services, programs, or activities of a public entity" include those services, programs and activities that public entities offer or undertake through third parties by means of contracts and other arrangements. That a public entity has contracted for the provision or occurrence of such services, programs and activities seems sufficient to make them "the services, programs, or activities" of that entity.

**[4]** Notwithstanding the deference owed to the Attorney General's reading of Title II and that provision's open and general language, defendants contend that the regulation plainly contradicts congressional intent, as expressed in the language and structure of the statute, and, accordingly, that it was error for the district court to rely on it. Their essential argument is that whereas another provision of the ADA, Title III, which bars discrimination on the basis of disability by certain private entities, contains language barring affected enti-

ties from effecting such discrimination either "directly, or through contractual, licensing, or other arrangements," Title II does not include any such language. According to defendants, this difference indicates that Congress unambiguously intended that public entities not be subject to liability for violations of the ADA when they provide programs or services through arrangements with third parties.

**[5]** This contention is baseless. First, the Title II and Title III provisions to which defendants point set forth similarly short and general nondiscrimination rules.[1] The Title III provision is followed by a "Construction" provision that spells out, in more than a thousand words, detailed requirements that the general rule imposes. *See* 42 U.S.C. § 12182. For example, the second of the Construction provision's seven parts specifies that the meaning of "[d]iscrimination includes failure" by those public entities described in the general rule "to (A) make reasonable modifications . . . . ; (B) provide auxiliary aids and services . . . ; and (C) remove barriers consistent with [certain] requirements . . . ." *Id.* at § 12182(b)(2)(A-C). It is unreasonable to read Titles II and III together as barring the Attorney General from adopting similar provisions with respect to the implementation of Title II. Rather than Congress having intended to prohibit the adoption of parallel provisions when implementing Title II, it is more likely that it

---

[1]Title II's prohibition on discrimination, 42 U.S.C. § 12132, reads:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

The "[g]eneral rule" of Title III, 42 U.S.C. § 12181(a), provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

intended just the opposite: that the Attorney General at the least consider Title III's Construction section when adopting regulations governing Title II.

**[6]** Second, consistent with the brevity of Title II's description of its prohibitions, the House Reports for the Title make clear that, rather than the difference between the language of Title III and that of Title II signalling Congress's intention to omit the protections outlined in Title III but not described in Title II, as defendants argue, Congress intended that the protections of Title III be incorporated into Title II and that Title II be construed in a manner consistent with the regulations governing the RA and its identical protections. For example, the House Committee on Education and Labor stated:

> The Committee has chosen not to list all the types of actions that are included within the term "discrimination", as was done in titles I and III, because this title essentially simply extends the anti-discrimination prohibition embodied in section 504 [of the Rehabilitation Act] to all actions of state and local governments. The Committee intends, however, that the forms of discrimination prohibited by section 202 be identical to those set out in the applicable provisions of titles I and III of this legislation.

H.R. Rep. No. 101-485, pt. 2, at 84 (1990). Similarly, the House Judiciary Committee stated that "Title II should be read to incorporate provisions of titles I and III which are not inconsistent with the regulations implementing Section 504 of the Rehabilitation Act of 1973." H.R. Rep. No. 101-485, pt. 3, 51 (1990). This statement of intent by the Judiciary Committee is echoed in the statute, which, as noted, includes a directive that the Department of Justice promulgate regulations implementing Title II that are consistent with the regulations governing Section 504 of the Rehabilitation Act. *See* 42 U.S.C. § 12134. The bar in the Title II regulation, 28 C.F.R.

§ 35.130(b)(1), on discrimination "through contractual, licensing, or other arrangements" is fully consistent with the regulations implementing Section 504: those regulations state, and have stated since their original promulgation in 1978, that a recipient of federal financial assistance may not discriminate "directly or through contractual, licensing, or other arrangements, on the basis of handicap." 28 C.F.R. § 41.51; *see also* 43 Fed. Reg. 2132, 2134 (Jan. 13, 1978); 46 Fed. Reg. 40686 (Aug. 11, 1981).

**[7]** Accordingly, the regulations are not "manifestly contrary to the statute." Indeed, they reflect the fairest reading of the statute. Defendants' contention that the regulations are invalid is in error.[2]

---

[2]*Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169 (9th Cir. 1999), on which defendants rely to make their structural argument, does not suggest a different result. In *Zimmerman*, this court found that Title II of the ADA did not cover employment discrimination, notwithstanding an implementing regulation that said that it did. This court reasoned that the text of Title II clearly concerns itself not with "inputs" of public agencies, such as employment, but with "outputs," including a public agency's "services, programs, [and] activities." *See id*. at 1174. It further reasoned that the structure of the ADA militated against a finding that Title II applies to employment. *See id.* at 1176-79. Title I of the ADA, entitled "Employment," deals extensively with employment, and regulating employment under Title II would both render Title I redundant and eviscerate its procedural requirements. *See id.* at 1176.

As relates to the instant case, consistent with this court's decision in *Zimmerman*, the challenged regulation applies Title II to an "output" of a public agency, namely the services, programs, and activities that the CDCR provides to or imposes upon class members. Moreover, there is no argument that the activities of the CDCR and Board that those agencies accomplish through contracting and similar arrangements with the counties are regulated by any other title within the ADA, much less that regulating those activities under Title II would eviscerate or in any way damage any other section of the ADA.

**IV**

Defendants also contend that, even if valid, 28 C.F.R. § 35.130(b)(1) and 28 C.F.R. § 41.51, the regulation implementing § 504 of the RA,[3] do not apply to their arrangements with the county jails because those arrangements do not provide prisoners and parolees with any "aid, benefit or service," but rather provide for the incarceration of such individuals.

[8] This contention is foreclosed by our precedent and that of the Supreme Court. Although we have noted that "incarceration itself is hardly a 'program' or 'activity' to which a disabled person might wish access," we have made clear that the ADA entitles inmates to receive the "benefits" of the incarcerating institution's programs and services without facing discrimination on account of a disability. *See Armstrong*, 124 F.3d at 1023. The Supreme Court has also rejected defendants' position, saying, "We disagree" with the contention "that state prisons do not provide prisoners with 'benefits' of 'programs, services, or activities' as those terms are ordinarily understood . . . . Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners." *Yeskey*, 524 at 210.

[9] Here, plaintiffs do not complain that they have been denied incarceration on account of their disabilities. Instead, they contend that, on account of their disabilities, they have been denied benefits provided to other incarcerated persons or required by due process. The State's contracts and arrangements with the counties are not simply to incarcerate parolees and prisoners, but to provide such individuals with various positive opportunities, from educational and treatment pro-

---

[3]Although defendants suggest that this regulation too was invalid, they offer no argument as to why, nor, incidentally, do they explain why, even if we found the Title II regulation invalid, the court could not have simply acted under § 504 and its implementing regulations.

grams, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication. The restrictions imposed by incarceration mean that all of these positive opportunities must be provided or allowed to individuals incarcerated pursuant to state contracts and arrangements to the same extent that they are provided to all other detainees and prisoners. Accordingly, such state-county arrangements include "benefits" of programs or services provided to class members by defendants through their contracts and other arrangements with the counties, and come under the purview of the ADA and its regulations.

## V

**[10]** Defendants next argue that the order violates the federalism principles announced in *Printz v. United States*, 521 U.S. 898, 919-21 (1997), and *New York v. United States*, 505 U.S. 144, 174-77 (1992).[4] This argument too is without merit. In *Printz*, the Supreme Court invalidated a provision of the Brady Act requiring state law enforcement officers to conduct background searches of prospective gun purchasers, which the court reasoned was in actuality an attempt to compel states to enact or enforce a federal regulatory program. *See Printz*, 521 U.S. at 904. In *New York*, the Court invalidated a federal law requiring states either to regulate the disposal of radioactive waste by private parties according to federal guidelines or to take title to such waste. *See New York*, 505 U.S. at 174-75. In both cases, what concerned the Court was the federal government's apparent attempt to commandeer state officials to help it enforce its regulatory schemes against third parties.

---

[4]Plaintiffs contend that the issue is waived, because it was not raised to the district court. This court, however, may hear an issue raised for the first time on appeal so long as "the issue presented is a pure question of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court," conditions which here obtain. *See Raich v. Gonzales*, 500 F.3d 850, 868 (9th Cir. 2009).

**[11]** Here, the district court did not order defendants to implement or enforce the ADA against third parties. At issue are defendants' own obligations under the ADA. The district court did not require the state to ensure that the county jails provide ADA accommodations to every person housed in those jails. It simply required the State to ensure ADA-compliant conditions for prisoners and parolees being held under its authority, whether it houses such persons in its own facilities or chooses to house them with the counties. The State's only obligation under the order is with regard to its own prisoners and parolees, and it is triggered in this case purely by the State's choice to house incarcerated persons in the county jails. The State could avoid all obligations to ensure that anyone in the county jails receives the accommodations required by the ADA by choosing not to house class members in those jails. This distinction — between a general mandate to enforce federal law, and a requirement that the state not avoid its own obligations under federal law by contracting with other entities — sets this case apart from the concerns expressed in *Printz* and *New York* about the federal government using the states as vehicles for the implementation and enforcement of federal laws. Finally, this case is not, like *Printz* and *New York*, an attempt by the federal government to require the State to carry out a federal obligation. Rather, it is an action by private parties — the class of plaintiffs — to enforce their own rights under federal law and the Constitution.

## VI

**[12]** Defendants' next contention is that the order runs afoul of the deference that courts must show to prison officials in order to ensure the safe and effective management of prisons. "[W]hen a prison regulation impinges on inmates' constitutional [or statutory] rights, the regulation is [nonetheless] valid if it is reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 84-85(1987); *Gates v. Rowland,* 39 F.3d 1439, 1446-47 (9th Cir. 1994).

Defendants argue that "the ordered plan requires that parolees be removed from county jails to CDCR prisons if jails exhibit 'patterns' of ADA non-compliance," and that they "have legitimate penological reasons to house accused parole violators in county jails rather than in state prisons," that outweigh any impingement on class members' federal rights.

**[13]** Defendants misstate what the order requires, and demand deference to which they are not entitled. The order does not contain any requirement that defendants shift parolees to CDCR facilities if the jails exhibit patterns of ADA non-compliance. Rather, it requires that if defendants become aware of a class member housed in a county jail who is not being accommodated, they either see to it that that jail accommodates the class member, or they move the class member to a facility — which could be either a CDCR facility or a county jail — which can accommodate his needs. *See Armstrong v. Schwarzenegger*, No. 4:94-cv-02307 (N.D. Cal. Sept. 16, 2009) at 13. If they become aware of a "pattern" of ADA noncompliance, they are to notify county jail officials and take steps to remedy the pattern of noncompliance. *Id.* at 13-14. These features of the plan reflect the fact that the policy that plaintiffs challenge is not that of housing some class members in jails, but that of failing to ensure that such class members receive the accommodations that they need and to which they are entitled. None of what defendants present as legitimate penological reasons addresses this latter policy, and we are not aware of any penological reasons that would support it.

## VII

**[14]** The Prison Litigation Reform Act provides that courts "shall not grant or approve any prospective relief [with respect to prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal

right." 18 U.S.C. § 3626(a)(1)(A). Defendants argue that the September 16 order violates this need-narrowness-intrusiveness requirement in two ways. First, they contend that a court must make the required need-narrowness-intrusiveness findings on a provision-by-provision basis, explaining why each element of the ordered relief is the narrowest and least intrusive means possible of correcting defendants' ADA violations, and that the district court failed to make the requisite findings. Second, they argue that the plan is neither narrowly drawn nor minimally intrusive.

[15] With regard to their first contention, the language of the PLRA does not suggest that Congress intended a provision-by-provision explanation of a district court's findings, and there is no practical reason why we should read such an obligation into the statute. Nowhere does § 3626(a)(1) explain what it means to "find[ ]" that relief is appropriate, nor does it explain whether "any prospective relief" refers to a remedial order as a whole or to each individual element of such an order. It makes at least as much sense from a semantic standpoint to read "relief" as referring to the district court's order as a whole as it does to read the term as referring to each separate provision of that order; it is, after all, the order as a whole that redresses the violation of federal law, and not any individual measure on its own. Accordingly, "[i]t cannot be said that § 3626(a)(1) is unambiguous, or clearly expresses Congress' intent to depart from the traditional standard — findings sufficient to allow a 'clear understanding' of the ruling — in favor of a painfully exacting standard under which courts make such findings on a paragraph by paragraph, or even sentence by sentence, basis." *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 342 (S.D.N.Y. 2001); *see also Gomez v. Vernon*, 255 F.3d 1118, 1129 (9th Cir. 2001) (the PLRA did "not substantially change[ ] the threshold findings and standards required to justify an injunction"). Thus, we understand the statutory language to mean that the courts must do what they have always done when determining the

appropriateness of the relief ordered: consider the order as a whole.

In many cases it would not be possible for a district court to produce meaningful need-narrowness-intrusiveness findings concerning each isolated provision of a remedial order. Prospective relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed of multiple elements that work together to redress violations of the law. This is all the more true when relief must be narrow and minimally intrusive: courts often must order defendants to make changes in several different areas of policy and procedure in order to avoid interjecting themselves too far into any one particular area of prison administration. In such circumstances, the necessity of any individual provision cannot be evaluated in isolation. What is important, and what the PLRA requires, is a finding that the set of reforms being ordered — the "relief" — corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures.

Moreover, where a court has explained clearly the factual circumstances underlying an order and its understanding of the relevant law as applied to the facts, to require more than a determination that it has found the requisite need, narrowness and lack of intrusiveness for that order would give rise to unwarranted challenges to the findings no matter how detailed those findings were and would unduly delay resolution of the already complicated proceedings necessary to remedy the underlying constitutional violations. *See Benjamin*, 156 F. Supp. 2d at 342. No one, not least the litigants hoping to secure final decisions, would be served by adopting the novel requirement that the state urges upon us.

**[16]** We have never previously held that it is necessary for a district court to provide a *Printz* and *New York* explanation of its need-narrowness-intrusiveness findings. Instead, we have upheld as sufficient under the PLRA overall statements

by the district court that the need-narrowness-intrusiveness standard has been met; indeed, in our review of the 1999 permanent injunction that the district court entered against the BPH we wrote approvingly of need-narrowness-intrusiveness findings by the district court that were delivered in exactly the same form as those at issue in the instant appeal. *See Armstrong*, 275 F.3d at 872.

Defendants' arguments with regard to their second contention, that the relief ordered as a whole is not the narrowest, least intrusive relief possible, are remarkably weak. They do not suggest any means to protect class members' rights under the ADA that are more narrow or less intrusive than those ordered by the district court. Intrusiveness is a particularly difficult issue for defendants to argue, as by ordering them to draft and promulgate a plan, the district court left to defendants' discretion as many of the particulars regarding how to deliver the relief as it deemed possible. Allowing defendants to develop policies and procedures to meet the ADA's requirements is precisely the type of process that the Supreme Court has indicated is appropriate for devising a suitable remedial plan in a prison litigation case. *See Armstrong*, 275 F.3d at 883 (Berzon, J., concurring); *see also Lewis v. Casey*, 518 U.S. 343, 362-63 (1996).

Additionally, the arguments that defendants make under the guise of intrusiveness do not address the core concern of the intrusiveness inquiry: whether the district court has "enmeshed [itself] in the minutiae of prison operations," beyond what is necessary to vindicate plaintiffs' federal rights. *See id.* at 362 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). Instead, they focus almost exclusively on the magnitude of the burden that the court's order imposes upon the State, an issue that is beside the point. A demonstration that an order is burdensome does nothing to prove that it was overly intrusive. With Congress having made the decision to recognize the rights of disabled persons, the question is not whether the relief the court ordered to vindicate those rights is expensive,

or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations. We note, moreover, that defendants' claims that the order is burdensome are belied by the proposed draft plan that they have circulated, which conforms in large part to the order's requirements and does so, according to their own earlier statements, at a fraction of the expense that they now claim that the order will compel them to incur.

Defendants' arguments that the relief ordered was not narrowly drawn are no more convincing. Defendants contend that the district court should have ordered them to develop a plan to share information concerning disabled parolees with the county jails in order to help the counties "enhance" their own ADA compliance. Beside trying to lay their own responsibilities at the feet of the counties, defendants do not suggest that such an information sharing plan would correct the federal law violations at issue: "enhanced" ADA compliance with regard to inmates kept in county jails may not constitute actual compliance.

**[17]** Defendants also suggest that it was not necessary for the district court to order them to ensure that class members housed in county jails are accommodated, because the class members could obtain a remedy by suing the jails. That another party could be sued, and that such a suit might ultimately lead to that party being ordered to do something to correct the violation of a federal right, is not a narrower or less intrusive form of relief within the meaning of the statute. It is elementary that a plaintiff may sue a party who is liable for his injury and that a defendant cannot avoid liability, or the remedy for that liability, by demonstrating that plaintiff could have sued another party as well. In other words, defendants cannot shirk their obligations under the ADA by suggesting that because an order requiring that a non-defendant provide relief to the plaintiffs would be narrower and less intrusive on defendants, the relief ordered by the court against

them does not satisfy the PLRA. Additionally, the counties could make the same argument in response to any relief ordered against them — that from their point of view relief would be narrower and less intrusive if the State were ordered to provide it — with the irrational and unacceptable ping-pong result that a plaintiff harmed by two entities could get no relief from either. In short, the defendants have the responsibility of ensuring that their prisoners are afforded their rights under the ADA, regardless of where the State incarcerates them, and the narrowest and least intrusive relief is the narrowest and least intrusive order that directs the State to provide or ensure the relief to which the plaintiffs are entitled.

Although we reject with little difficulty the principal arguments advanced by the State, we cannot affirm the district court's determination that the relief it ordered "extend[ed] no further than necessary to correct the violation of the Federal right." Such a determination cannot be made without evidence sufficient to identify the nature and scope of the violations of federal rights that are to be corrected. As we explain below, the evidentiary record in this case is an insufficient basis for the scope of the relief that has been ordered.

## VIII

**[18]** "The scope of injunctive relief is dictated by the extent of the violation established." *Lewis*, 518 U.S. at 539. "[I]f injunctive relief is premised upon only a few isolated violations affecting a narrow range of plaintiffs, its scope must be limited accordingly." *Armstrong*, 275 F.3d at 870. However, "if the injury is the result of violations of a statute . . . that are attributable to policies or practices pervading the whole system (even though injuring a relatively small number of plaintiffs)," then "[s]ystem-wide relief is required." *Id.* Defendants argue that plaintiffs presented insufficient evidence to justify the system-wide relief ordered by the district court. Although it is a close question, we agree.

In issuing its order, the district court relied on very sparse evidence of actual ADA violations in the county jails. Plaintiffs provided a great deal of hearsay reporting ADA violations in the county jails as well as a lack of grievance procedures for remedying those violations, but the district court stated that it relied on only the few pieces of evidence that it determined were admissible, including an affidavit in which one of plaintiffs' attorneys described an observation of nonaccessible bathroom facilities in a county jail; a declaration from another attorney describing his observation of parolees with obvious difficulty walking who had not been provided with canes or wheelchairs; documentation produced by defendants showing that wheelchair-bound prisoners and certain diabetics are not allowed to participate in the drug treatment alternative to incarceration for parole violators in Orange County jail; and a CDCR memo admitting to a several-days delay in transporting a paraplegic parolee from jail to his hearing because no accessible vehicle was available. The district court allowed that "many" of the ADA violations on which it relied related to individuals who were not necessarily *Armstrong* class members, but stated that the evidence nonetheless "support[ed] the inference that county jails do not provide reasonable accommodations for . . . class members."

**[19]** Defendants allege that much of the evidence on which the district court relied was inadmissible hearsay. We do not reach this contention. Even assuming that all the evidence on which the district court relied was admissible, and even according the district court the heightened deference that is appropriate "where the court has been overseeing complex institutional reform litigation for a long period of time," *Jeff D. v. Kempthorne*, 365 F.3d 844, 850 (9th Cir. 2004), the evidence here constituted an insufficient basis for the system-wide relief that was ordered. We have previously stated that an appeals court must defer to a district court's determination that system-wide relief is required "[s]o long as [its] conclusion is based upon adequate findings supported by substantial evidence in the record." *Armstrong*, 275 F.3d at 871. The evi-

dence of ADA violations in the jails with regard to class members, however, cannot be described as "substantial": it is composed largely of single incidents that could be isolated. Plaintiffs argue that "the decision to grant system-wide prospective injunction relief does not occur in a vacuum; it is intimately connected to determinations made earlier in the lawsuit." *See id.* at 870-71. Plaintiffs do not, however, point to any past determinations that show that class members housed in county jails are not being accommodated. More important, in issuing its order, the district court failed to identify any such determinations, and thus, we are required to conclude, did not rely on them when determining the scope of its order.

[20] Accordingly, we conclude that the district court abused its discretion by granting system-wide relief on the basis of the sparse evidence on which it based its order, and remand to allow it to take such additional evidence as may be necessary concerning the nature and extent of the violations of class members' rights taking place in the county jails. We note, however, that the burden facing plaintiffs, while formidable, is far from insurmountable. As we stated above, it is a close question as to whether the evidence currently in the record is sufficient to sustain the current order. It is undisputed that the State houses many class members in the county jails, and that it has no adequate system for tracking and accommodating those class members. As we have previously observed, "[b]ecause the regulations implementing the ADA require a public entity to accommodate individuals it has identified as disabled . . . some form of tracking system is necessary in order to enable [defendants] to comply with the Act." *Armstrong*, 275 F.3d at 876. This system-wide deficiency took plaintiffs much of the way towards a showing sufficient to justify the system-wide relief ordered by the district court, but it was not enough in itself, or in tandem with the minimal evidence of violations that was adduced, to justify the scope of the relief that was ordered. Nonetheless, in light of the State's failure to track many of the class members that

it houses in the county jails, not much more evidence than that already provided may be required to approve the current order. At the same time, we might observe that, in this case as in others, too much evidence would certainly be preferable to too little.

## IX

**[21]** For the reasons stated above, we affirm the district court's determination that defendants cannot shirk their obligations to plaintiffs under federal law by housing them in facilities operated by the third-party counties.[5] This holding should come as no surprise. Defendants' arguments as to this issue were of a barely colorable nature, constituting attacks on manifestly valid regulations. Moreover, even in the absence of a regulation explicitly saying so, a State cannot avoid its obligations under federal law by contracting with a third party to perform its functions. The rights of individuals are not so ethereal nor so easily avoided. We must vacate, however, the portion of the district court's decision ordering prospective relief. Injunctions, whether controlled by the PLRA or otherwise, require evidence of rights violations commensurate with the scope of the relief being ordered. Here, the evidence relied upon by the district court was insufficient to justify that scope. We remand to allow the parties to adduce additional evidence and to permit the district court to prepare an order supported by the evidence before it. In doing so, it may of course take notice of the evidence of earlier proceedings already in the record, but must identify such evidence with specificity.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART**

---

[5]We deny plaintiffs' motion for judicial notice and note that no judicial notice is required for most of the materials for which plaintiffs requested it. *See* Fed. R. Evid. 201 advisory committee's note.