In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 22-1368

JAMES G. HOWE, *et al.*,

*Plaintiffs-Appellees,*

*v.*

LATOYA HUGHES,* in her official capacity as Acting Director
of the Illinois Department of Corrections, *et al.*,

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:14-cv-844 — **Staci M. Yandle**, *Judge.*

_____

ARGUED JANUARY 10, 2023 — DECIDED JULY 24, 2023

_____

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit
Judges.*

SCUDDER, *Circuit Judge.* Very weighty interests are at stake
when a state institutes a program of civil commitment for sex

---

* Latoya Hughes replaced Rob Jeffreys as Acting Director of the Illi-
nois Department of Corrections on April 1, 2023, so we have substituted
her as a party to this case. See Fed. R. App. P. 43(c)(2).

offenders who, though never tried for or convicted of a crime, are found too dangerous for release. On the one hand is the state's interest in promoting public safety, and on the other is an individual's liberty interest. The Fourteenth Amendment's Due Process Clause permits the balance of these interests to tip in the state's favor—but only if the state adheres to particular mandates to ensure the liberty restrictions go no further and last no longer than necessary. The necessary balance requires states to afford sex offenders treatment sufficient to permit a realistic opportunity for rehabilitation and, ultimately, release.

The broader issues presented in this case are all about this constitutionally necessary balancing—all about whether Illinois, in implementing a civil commitment program under the state's Sexually Dangerous Persons Act, is complying with its obligations under the Fourteenth Amendment. The record before us leaves us concerned that the state is not holding up its end of the balance. Civil detainees under the state's Sexually Dangerous Persons Program receive minimal treatment, raising serious questions whether rehabilitation and release are realistically available to them.

Yet we can decide this appeal without fully immersing ourselves in the broader issues. The district court, though understandably focused on curing the constitutional defects in Illinois's civil commitment program, issued too broad an injunction under the strictures of the Prison Litigation Reform Act. We therefore reverse and remand.

# I

## A

The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." How this applies in the context of criminal law is all too familiar. To find someone guilty of a crime and thus deprive them of liberty, the state must abide by a wide array of due process protections. See, *e.g.*, *In re Winship*, 397 U.S. 358, 364 (1970); *Estelle v. Williams*, 425 U.S. 501, 512 (1976). And to cement the deprivation of liberty with a criminal sentence, the state must continue to ensure due process of law. See *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). For all but the most serious offenses, this process culminates in a sentence that establishes a definite term of imprisonment—one with an end date.

In the context of civil commitment, though, the protections of the Fourteenth Amendment operate a little differently. The Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). At the same time, however, the Court has acknowledged that states have "a legitimate interest … in providing care to [their] citizens who are unable because of emotional disorders to care for themselves." *Id.* at 426. This interest, the Court has explained, parallels states' "authority under [their] police power to protect the community from the dangerous tendencies of some who are mentally ill." *Id.* So the Court has upheld state programs that civilly detain individuals as long as the detainee suffers from a mental illness *and* exhibits some form of violent behavior. See, *e.g.*, *Addington*, 441 U.S. at 426 ("[T]he State has no interest in

confining individuals involuntarily if they are not mentally ill or if they do not pose some danger to themselves or others."); *Kansas v. Hendricks*, 521 U.S. 346, 357–58 (1997) ("States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety."); *Foucha v. Louisiana*, 504 U.S. 71, 78 (1992) ("[K]eeping [a detainee] against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness.").

No doubt civil confinement "constitutes a significant deprivation of liberty" and "can engender adverse social consequences," thereby "requir[ing] due process protection." *Addington*, 441 U.S. at 425–26. The Fourteenth Amendment requires states to balance their interests—caring for citizens suffering from mental illness and protecting the community—against the liberty interests of those who it seeks to civilly detain. See *id.* at 425 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). This balance can only be struck where the state's interest in civil commitment is not punitive. See *id.* at 428; *Allen v. Illinois*, 478 U.S. 364, 373–74 (1986); *Foucha*, 504 U.S. at 80; *Hendricks*, 521 U.S. at 361.

Unlike incarceration following a criminal conviction, civil commitment often does not have a set end date. That follows from the purpose of civil commitment—to provide rehabilitation and treatment, not retribution and deterrence. See *Allen*, 478 U.S. at 369–70; *Hendricks*, 521 U.S. at 363–64. "[B]ecause it is impossible to predict how long it will take for any given individual to recover," the Supreme Court has explained, it is permissible "to leave the length of commitment indeterminate, subject to periodic review." *Jones v. United States*, 463

U.S. 354, 368 (1983). That periodic review is important: a civil detainee "is constitutionally entitled to 'immediate release upon a showing that [he] is no longer dangerous or mentally impaired.'" *Hughes v. Dimas*, 837 F.3d 807, 808 (7th Cir. 2016) (alteration in original) (quoting *Hendricks*, 521 U.S. at 368–69). As long as the state diligently reevaluates detainees' mental health status and dangerousness, though, it may continue to commit them indefinitely. See *Hendricks*, 521 U.S. at 358.

This is where treatment comes into play. Civil detainees must actually "receive treatment for the disorders that led to their confinement and be released when they've improved enough no longer to be dangerous." *Hughes*, 837 F.3d at 808 (citing *Hendricks*, 521 U.S. at 368–69, and *Allen*, 478 U.S. at 369–74); see also *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982) ("When a person is institutionalized—and wholly dependent on the State— … a duty to provide certain services and care does exist."). It is not enough for a state to purport to offer treatment but in reality provide next to nothing (or nothing at all). See *United States ex rel. Stachulak v. Coughlin*, 520 F.2d 931, 936 (7th Cir. 1975) ("It is well settled that realities rather than benign motives or noncriminal labels determine the relevance of constitutional policies."), *abrogated on other grounds by Addington*, 441 U.S. at 427–31. Indefinite civil commitment with no meaningful treatment and no realistic possibility of release violates the constitutional command that "the nature of commitment [must] bear some reasonable relation to the purpose for which the individual is committed." *Foucha*, 504 U.S. at 79.

The essential takeaway is that civil detainees are "entitled to non-punitive programs designed using the exercise of professional judgment." *Allison v. Snyder*, 332 F.3d 1076, 1080 (7th Cir. 2003) (citing *Romeo*, 457 U.S. at 321–22). Indeed, states

must invest resources to ensure that their civil commitment programs—both in design and in practice—provide detainees sufficient treatment to make release a realistic possibility. If a state fails to do so and its program becomes "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base [their decisions] on such a judgment," then the state has violated the Fourteenth Amendment. *Romeo*, 457 U.S. at 323.

B

Illinois's Sexually Dangerous Persons Act authorizes the state's Director of Corrections—currently Latoya Hughes, the lead defendant—to involuntarily commit and indefinitely detain individuals who have been charged with a crime and found to "suffer[ ] from a mental disorder … coupled with criminal propensities to the commission of sex offenses" and "propensities toward acts of sexual assaults or acts of sexual molestation of children." 720 ILCS 205/1.01, /3, /3.01, /8. The Act ensures that the Director "shall provide care and treatment for the person committed to him designed to effect recovery." *Id.* at 205/8. Once detainees have recovered enough to be deemed "no longer dangerous," the state must discharge them. *Id.* at 205/9(e). The state may conditionally discharge detainees under continued supervision, but only if "it is impossible to determine with certainty under conditions of institutional care that the person has fully recovered." *Id.*

Recognize that the Act, by its terms, aligns with the mandates of the Due Process Clause. Indeed, the Supreme Court reviewed the Act in *Allen v. Illinois*, 478 U.S. 364 (1986), and came to that exact conclusion. The Court determined that the Act provides for civil—rather than criminal—commitment,

stressing that Illinois "disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement." *Id.* at 370. It is because of these very characteristics of the Act—the lack of punitive intent, the availability of treatment, and the realistic possibility of release—that Illinois does not violate the Fourteenth Amendment when it detains sexually dangerous persons. See *Hughes*, 837 F.3d at 808 (reversing and remanding where it was "unresolved" in the record whether Illinois was providing detainees with treatment and release consistent with the Act); *Allison*, 332 F.3d at 1079 (explaining that because sexually dangerous persons receive treatment under the Act, Illinois's decision to house them in prison facilities does not "signify punishment").

## II

Our observation that the Act is constitutional in its general design does not resolve this appeal, however. Grave questions remain about how the Act is applied in practice. Recall that "realities rather than benign motives or noncriminal labels determine the relevance of constitutional policies," *Coughlin*, 520 F.2d at 936, so civil detainees must actually "receive treatment for the disorders that led to their confinement and be released when they've improved enough no longer to be dangerous." *Hughes*, 837 F.3d at 808. This case implicates these practical concerns.

### A

The plaintiffs—James Howe, Jacob Kallal, and George Needs—have been committed under the Act to the Big Muddy River Correctional Center Sexually Dangerous

Persons Program. Howe was conditionally discharged on May 24, 2023, while Kallal and Needs remain at Big Muddy.

The treatment program at Big Muddy includes three kinds of group therapy: core therapy, offense-specific therapy, and didactic (or educational) therapy. Every detainee participates in a core therapy group that meets weekly. Only those detainees who have acknowledged their prior sexual misconduct may participate in offense-specific and didactic therapy groups. Offense-specific therapy groups cover topics such as Victim Empathy, Cycles of Sexual Offending, and Relapse Prevention. Similarly, didactic therapy groups address topics like Anger Management, Social Skills, Substance Abuse, and Expressive Art. Didactic therapy sessions are offered on a rotating basis. Big Muddy does not provide individual therapy.

The treatment program consists of four sequential phases. To advance to the next phase, a detainee must maintain a clean disciplinary record, show progress in therapy, and complete certain assessments. Therapists evaluate detainees semi-annually and provide them with a copy of their evaluations as well as six-month treatment plans, but detainees may discuss their evaluations with the therapists only in group therapy, not one-on-one.

The state contracts with Wexford Health Sources, a healthcare services company, to evaluate detainees for release. Wexford reviews the risk posed by each detainee seeking release with reference to the detainee's semi-annual reports, treatment plans, therapists' case notes, and interviews with therapists and the detainee. Based on this information, Wexford recommends either discharge, conditional discharge, or continuation in the Big Muddy program.

B

In July 2014 the plaintiffs filed this lawsuit alleging that the treatment program at Big Muddy was being run in a constitutionally deficient manner. Over four years later, in October 2018, the district court held a two-day bench trial in which the plaintiffs testified as fact witnesses and Dr. Dean Cauley—a former clinical team leader and therapist at the Florida Civil Commitment Center for Sexually Violent Predators—testified as an expert witness. The district court issued its findings of fact and conclusions of law three years later, in September 2021.

We follow the lead of both parties in accepting the district court's factual findings, though we note that significant time has passed since the trial, which has no doubt led to operational changes within the Big Muddy program. Indeed, both parties disputed the existence, nature, and legal significance of intervening developments in their post-trial papers and at oral argument. But it is not our role to pass judgment on such assertions for the first time on appeal, nor is any purported legal development relevant to our legal analysis. We are confident that a justiciable controversy remains regardless of any operational changes at Big Muddy or the conditional release of one of the named plaintiffs. See *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). To the extent that any changes to the Big Muddy program have legal significance to the nuts and bolts of what prospective relief is appropriate, the district court is better situated to explore those issues and will have a chance to do so on remand. Our focus, meanwhile, is on how things were at Big Muddy in October 2018.

At that time Big Muddy housed 170 civil detainees with three therapists on staff. The 170 detainees were split into twelve core therapy groups, which met once per week for one hour. Many of the offense-specific and didactic therapy groups were on hold—including, for example, the Victim Empathy group, which had not been offered since 2015.

Testifying for the plaintiffs, Dr. Cauley surveyed data from a national network of civil commitment facilities and opined that Big Muddy's program offerings and operation fell significantly short of professional norms. Every other facility on record, Dr. Cauley explained, provides multiple core group therapy sessions per week, whereas Big Muddy stands alone in offering just one weekly session. And as a result of such infrequent meetings, Big Muddy only provides one hour of weekly core therapy, in contrast to the national average (7.5 hours) and the generally accepted minimum (5 hours). Similarly, Dr. Cauley testified that certain offense-specific and didactic groups, such as Substance Abuse and Victim Empathy, are "critical" to detainees' treatment and should always be available, even to detainees who have not yet acknowledged their prior misconduct. But Big Muddy had indefinitely canceled these treatment offerings. Finally, Dr. Cauley explained that evaluators should prioritize indicators such as age and the passage of time over past conduct when considering detainees' discharge petitions. Wexford, however, did not even consider age or passage of time and instead gave meaningful weight to detainees' past conduct.

The district court accepted Dr. Cauley's findings and concluded that the disparity between Big Muddy's treatment program and professional standards amounted to a constitutional violation. Alongside entering its findings of fact and

conclusions of law, the district court issued a three-pronged permanent injunction, requiring that Big Muddy

- provide the plaintiffs a minimum of 7.5 hours of core group therapy per week, with each session lasting no less than 90 minutes;

- reinstate all inactive offense-specific and didactic groups, including groups that Dr. Cauley identified as foundational (such as Substance Abuse) as well as other groups on hold (such as Expressive Art); and

- use independent evaluators other than Wexford to perform discharge evaluations.

The state moved for reconsideration. It claimed the injunction was overbroad under the Prison Litigation Reform Act, which limits the possible scope of prospective relief in civil actions "with respect to prison conditions." 18 U.S.C. § 3626(a)(1)(A). The district court saw no overbreadth and therefore denied the state's motion.

The state now appeals.

### III

Without disputing that constitutional violations were occurring at Big Muddy, the state presses a narrower point on appeal. It challenges only the scope of the injunction under the PLRA. On that limited front, we agree. The PLRA restricts the district court's injunctive power, and the current injunction is overbroad.

### A

Through the Prison Litigation Reform Act, Congress mandated that "[p]rospective relief in any civil action with respect

to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A). The plaintiffs first attempt to sidestep the PLRA by asserting that it does not apply to their claims at all.

Their efforts on this front are forfeited. The district court made clear as early as 2014, when it first screened the plaintiffs' claims, that it saw this case as governed by the PLRA. Furthermore, the state expressly argued that the injunction violated the PLRA in its October 2021 motion for reconsideration. Even then the plaintiffs did not raise this argument until seven months later, once the case was on appeal. That is too late. See *Allen v. City of Chicago*, 865 F.3d 936, 943–44 (7th Cir. 2017); see also *United States v. Knox*, 624 F.3d 865, 873 n.6 (7th Cir. 2010) (treating arguments as forfeited, rather than waived, when it was "not clear" that the defendant made a strategic choice not to make them).

Because the district court will need to reconsider the scope of its injunction on remand, we nevertheless exercise our discretion to consider the plaintiffs' forfeited arguments to make clear that they fail as a legal matter. See *Hacker v. Dart*, 62 F.4th 1073, 1082 (7th Cir. 2023). The plaintiffs' first contention—that they are not "prisoners" under the PLRA—misreads the relevant statutory language. While other provisions of the PLRA are limited to suits brought "by prisoners," the provision at issue here is not so constrained. Compare 42 U.S.C. § 1997e(a) (imposing exhaustion requirements on suits brought "by a prisoner"), with 18 U.S.C. § 3626(a)(1)(A) (restricting federal courts' injunctive authority "in any civil action with respect to prison conditions").

The plaintiffs next contend that because their treatment is the very "basis" for their continued confinement, not a condition of their confinement, their suit is not one "with respect to prison conditions." But this view runs headlong into the Supreme Court's conditions-of-confinement jurisprudence, which applies when interpreting the PLRA. See *Porter v. Nussle*, 534 U.S. 516, 527–28 (2002). In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Court held that a prisoner's challenge to parole proceedings was a challenge to the conditions of his confinement even though parole proceedings are effectively the basis for a prisoner's continued confinement. See *id.* at 82. The Court has since articulated the standard this way: if an inmate's legal victory does not "necessarily imply the invalidity of his conviction or sentence," his claim remains a "prison-conditions claim" governed by the PLRA. *Nance v. Ward*, 142 S. Ct. 2214, 2222 (2022) (quoting *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). Applied to this case, a victory for the plaintiffs (such as an injunction requiring constitutionally adequate treatment) would not necessarily imply their speedier discharge from the Big Muddy program. So the plaintiffs' argument on this front fails as well.

B

Returning to the text of the PLRA, we see that Congress mandated that any injunction with respect to prison conditions "extend no further than necessary to correct the violation," be "narrowly drawn," and be "the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(a)(1)(A). Interpreting this very limitation, we have explained that federal courts must take care not to "conflate[ ] what is constitutionally *adequate* … with what is constitutionally *required*."

*Westefer v. Neal*, 682 F.3d 679, 683–84 (7th Cir. 2012) (emphasis in original).

Our case law has identified two dimensions to the PLRA's mandate against overbreadth. First, an injunction that imposes numeric requirements cannot do so at a level that exceeds the constitutional floor. See *Rasho v. Jeffreys*, 22 F.4th 703, 713–14 (7th Cir. 2022) (reversing a district court injunction that "set staffing at levels sufficient to *exceed* the constitutional minimum" (emphasis in original)). That is not to say that federal courts may never set numeric benchmarks. See *id.* at 713. To the contrary, the Supreme Court blessed such an injunction in *Brown v. Plata*, 563 U.S. 493, 538–41 (2011), after intensive fact-finding established that a specific numeric target "was necessary to remedy the constitutional violations." *Id.* at 540. But such injunctions cannot extend further than necessary to address the violation at issue.

The second dimension to the PLRA's limit on prospective relief is that such relief may not be too prescriptive. At bottom, federal courts must ensure that "substantial discretion and flexibility" remain "in the hands of the prison administrators." *Westefer*, 682 F.3d at 685; see also *Romeo*, 457 U.S. at 317. That is essential if an injunction is to be narrowly drawn and as unintrusive as possible.

The injunction before us here is overbroad in both respects. It requires that the Big Muddy Program provide 7.5 hours of weekly core group therapy despite the district court's express finding that 5 hours of core therapy per week would be constitutionally adequate. Indeed, Dr. Cauley—the plaintiffs' expert—favorably referenced other treatment programs that provide only 5 hours of core therapy per week. Although he explained that those programs had other

therapeutic and educational opportunities available for de-
tainees, the injunction entered by the district court does not
give Big Muddy flexibility to implement, say, 7.5 hours of *any*
form of weekly group therapy. Rather, the injunction requires
7.5 hours of *core* group therapy, which is above the constitu-
tional floor and therefore extends further than necessary to
remedy the violation.

The remaining provisions of the injunction fail for a differ-
ent reason: they are too prescriptive. As to the reinstatement
of canceled offense-specific and didactic groups, the injunc-
tion does not give Big Muddy the option to rotate between
programs based on actual need. While the evidence may sup-
port a finding that some groups (like Victim Empathy or Sub-
stance Abuse) should be offered with more consistency, it
does not support the same finding with respect to all groups
(such as Expressive Art, which the injunction includes). And
the injunction's prohibition on Wexford providing evaluation
services to the program is even less grounded in the evidence.
While it is true that a detainee's past conduct is only relevant
to their continued detention to the extent it sheds light on
their present dangerousness, see *O'Connor v. Donaldson*, 422
U.S. 563, 574–75 (1975); *Allen*, 478 U.S. at 371, on this record
we see no constitutional hook to single out a specific contrac-
tor and prohibit them from providing services to state facili-
ties. Doing so is not the least intrusive means available to cor-
rect the constitutional violation at issue.

## IV

It is sufficient for purposes of resolving this appeal to con-
clude the injunction is overbroad. But because we remand for
the district court to craft a new injunction consistent with the

PLRA and our opinion, we offer some parting thoughts to help guide this litigation across the finish line.

*First*, the parties should ensure that they present thorough evidence to the district court as to what kind and level of treatment they believe constitutes the constitutional floor. See *Westefer*, 682 F.3d at 683–84; *Romeo*, 457 U.S. at 322–23. If the parties fail to do so, or if their evidence is irreconcilable, the district court remains free to employ the resources at its disposal to develop a strong evidentiary foundation for its forthcoming injunction. See, *e.g.*, Fed. R. Evid. 706(a) (permitting the court to appoint its own expert witness).

*Second*, the district court must take care to connect any prospective relief to a specific constitutional violation. For instance, if the district court remains concerned about Wexford relying too heavily on past conduct when evaluating detainees for discharge, it needs to explain how its concern maps onto the protections of the Fourteenth Amendment. See *Hughes*, 837 F.3d at 808 (explaining that the Fourteenth Amendment requires inmates be released if they are no longer dangerous); *Allen*, 478 U.S. at 371 (approving of Illinois's civil commitment program because it "primarily" uses past conduct "to show the accused's mental condition and to predict future behavior"). And it must tailor its injunction to addressing only those constitutional concerns.

*Third*, the state may not continue to rely on cost and logistical difficulties to evade its constitutional obligations. The PLRA does not shield states from unwanted expenditures necessary to comply with constitutional mandates. See *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1071 (9th Cir. 2010) ("[T]he question is not whether the relief the court ordered … is expensive, or difficult to achieve, but whether the same

vindication of federal rights could have been achieved with less involvement by the court in directing the details of [the prison's] operations."). If Illinois continues to operate the Big Muddy program in violation of the Fourteenth Amendment, it may expose itself to far more drastic and costly measures than those it has so far avoided in this case. See generally *Plata*, 563 U.S. 493 (affirming an injunction that required California to reduce its prison population by roughly 40,000 inmates).

*Fourth*, this case is nearly a decade old, and we urge the district court and the parties to work together to bring it to a prompt resolution following remand. The district court can and should set an aggressive briefing schedule, and the parties must do everything in their power to comply. The district court may suggest the parties try mediation to speed up the process. If it does so, we expect they will engage in good faith.

\*       \*       \*

No doubt the Constitution permits Illinois to operate a civil confinement program for sexually dangerous persons. But it does so only as long as there is a careful balancing of the state's interest in the safety of its citizens against those individuals' liberty interest. By providing inadequate treatment and, as a result, depriving detainees of a realistic possibility of release, Illinois has failed to uphold its end of the balance. The state should right these constitutional wrongs without delay.

Still, the district court's injunction is overbroad under the PLRA, so we VACATE the injunction and REMAND for further proceedings consistent with this opinion.