FILED
United States Court of Appeals
Tenth Circuit

January 23, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENH CIRCUIT**

---

JEFFREY ALLEN PHILLIPS,

  Plaintiff - Appellant,

v.

SUSAN TIONA, Doctor, Kit Carson
Correctional Center; HOYT BRILL,
Warden, Kit Carson Correctional
Center; JODI GRAY, Health
Administrator, Kit Carson
Correctional Center; CORRECTIONS
CORPORATION OF AMERICA,
owner of private KCCC;

  Defendants - Appellees.

No. 12-1055

(D. Colorado)

(D.C. No. 1:10-CV-00334-PAB-KMT)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, **ANDERSON**, and **EBEL**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

---

[*]This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

of this appeal.  See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.

Jeffrey Allen Phillips, a state prisoner proceeding pro se, brought this 42 U.S.C. § 1983 and Americans with Disabilities Act ("ADA") action claiming that the Corrections Corporation of America ("CCA") and three of its employees at the Kit Carson Correctional Center ("KCCC") were deliberately indifferent to his medical needs in violation of the Eighth Amendment, and failed to accommodate those needs in violation of Titles II and III of the ADA and § 504 of the Rehabilitation Act.[1]  Pursuant to Fed. R. Civ. P. 12(b)(6), the district court dismissed the Eighth Amendment claim against the defendants Warden Hoyt Brill and CCA, and dismissed Mr. Phillips' § 504 claim against all defendants. Subsequently the court granted the defendants' motion for summary judgment on all remaining claims.  For the reasons stated below, we affirm.

## BACKGROUND

On August 25, 2009, while he was assigned to a halfway house, Mr. Phillips fractured the fibula in his right leg.  On August 26, 2009, Dr. David Matthews, an orthopedic surgeon, repaired the fracture using two metal plates and seven screws.  One of those screws was a 4.5 mm cortical screw (the syndesmotic

---

[1]42 U.S.C. §§ 12132, 12182, and Rehabilitation Act of 1973 (§ 504), 29 U.S.C. § 794.

-2-

screw) inserted across the syndesmosis (a wide sheet of ligament connecting the fibula to the tibia at the ankle) tying the fibula and tibia together. R. Vol. 4 at 222-23. After the operation, Mr. Phillips was taken to the El Paso County Jail.

Dr. Matthews next saw Mr. Phillips for a follow-up visit on September 11, 2009, noting the fixation to be in proper position and that the "ankle wound [was] healing well." Id. at 228-29. He prescribed Tylenol or Tylenol 3 for pain and directed corrections personnel at the El Paso County Jail to bring Mr. Phillips back "in about a month for an X-ray of his right ankle out of the cast. At that point we will make plans to remove the syndesmotic screw." Id. at 228. Phillips was to "remain [non-weight-bearing] on crutches." Id. at 229. The record suggests that the next appointment was scheduled for October 13, 2009. However, on October 8, 2009, Mr. Phillips was regressed to KCCC to continue serving his sentence. While Mr. Phillips was at the El Paso County Jail, doctors there additionally prescribed Neurontin for a thirty-day period.

Mr. Phillips remained at KCCC for about two months, until his transfer to the state-operated Sterling Correctional Facility ("SCF") on December 11, 2009. While at KCCC, he was under the medical supervision of defendants Dr. Susan M. Tiona, a physician employed by CCA to provide medical services to inmates housed in KCCC, and Jodi Gray, a Health Services Administrator at KCCC, as well as others.

During his two months at KCCC, Mr. Phillips mounted a vociferous, sometimes strident, and ongoing campaign to have the syndesmotic screw removed from his ankle. He submitted dozens of requests/demands by way of grievances, "kites" and other means to Dr. Tiona, Administrator Gray, Warden Brill and others (including the Governor, the Department of Corrections, and Doug Roberts, a Medical Monitor for the private Prisons Monitoring Unit of the Colorado Department of Corrections ("CDOC")) contending that Dr. Matthews had directed that the screw be removed on October 8, the date of his arrival at KCCC. Failure to do so, Mr. Phillips asserted, would result in him walking with a limp. He also contended that Dr. Matthews wanted him to remain non-weight-bearing until the screw was removed, so he apparently continued on crutches, or at least not using his right leg, although he was issued a walker on November 5. On November 10 he was told to start placing some weight on his right leg since the fracture had healed.

On or about October 13, Dr. Tiona ordered an x-ray of Mr. Phillips' ankle, to be taken at the next scheduled arrival of CCA's portable x-ray equipment at KCCC. The x-ray was performed on October 28, 2009, and a diagnostic report was issued on October 29, 2009, by Dr. Benjamin Huang. Dr. Huang stated that the x-ray showed a "well fixated fracture of right distal fibula and without displacement." Id. at 273. The doctor also noted that there was no dislocation and that the ankle mortise was intact. Id.

On October 28 and again on October 30, 2009, Administrator Gray responded to complaints by Mr. Phillips by advising him that the x-rays just taken were being evaluated by Dr. Tiona. Id. at 346, 366. Then, on November 5, 2009, Dr. Tiona removed Mr. Phillips' cast and entered the following note in Mr. Phillips' Ambulatory Health Record: "X-ray taken on 10/29/09 shows well healed fracture with hardware in place, including syndesmotic screw through fibula and tibia. Cast removed without difficulty. His surgical incision is nicely healed. Leg is thoroughly cleaned up. He received a walker to use in his cell until I hear back [exhibit indecipherable] . . . about ambulation." Id. at 279.

In her affidavit in support of her Motion for Summary Judgment, Dr. Tiona relates her actions and conclusions from that point, as follows:

6. Denver Health Medical Center is the referring facility used by Kit Carson Correctional Facility.

7. After identifying Plaintiff's postsurgical status, I consulted with an Orthopedic PA at Denver Health Medical Center. The Orthopedic PA conveyed to me that the removal of the syndesmotic screw is elective and that his department does not routinely remove the screw. Further, it is expected that the screw will break after the patient starts weight-bearing. If persistent pain exists 3 to 6 months after the screw breaks, the screw can then be removed.

8. In addition to the consultation with Denver Medical Health Centers, I reviewed orthopedic literature about weight-bearing and screw removal.

9. From the recommendation of my consulting specialist, as well as the support from the current orthopedic literature, there was no medical necessity to remove the syndesmotic screw during the

time that Plaintiff was under my care at Kit Carson Correctional Center.

Id. at 82.  Based on information she had received and researched, as well as her experience,[2] and her conclusions, Dr. Tiona then reported to the Medical Monitor, Doug Roberts, by e-mail on November 6, 2009:

> Briefly .... removed his cast on Thursday.  Surgical site looks good. X-ray showed well-healed distal fib fracture with stable hardware.  I e-mailed DHMC Ortho about the necessity for screw removal – as I suspected, there is no need to have the syndesmotic screw removed. It will naturally break (the screw, that is) when the patient starts to bear weight.  The fact is that he is being treated quite appropriately. I will follow-up with a phone call to you next week, though, in case you have any other questions.

Id. at 91.  Dr. Tiona conveyed this information to Mr. Phillips on November 10, noting the following information in his Ambulatory Health Record:

> Visited Mr. Phillips in segregation.  Discussed with him that I had communicated with orthopedics at DHMC and that the syndesmotic screw does not need to be removed.  He can start his ROM [range of motion] exercises (I reviewed these with him verbally), and can bear weight as tolerated, using the walker for support as needed for the next couple of weeks until his ankle gets stronger.

Id. at 280.

Subsequently Dr. Tiona examined Mr. Phillips on December 1, 2009, and made the following notation in the Ambulatory Health Record:

> I took his right ankle in my hands and started working with it. Initially, there was basically zero ROM–both voluntary and

---

[2]In her answers to interrogatories, Dr. Tiona stated that she had "managed the post-surgical care of several other inmates over the past 6 years with the same ORIF procedure."  Id. at 473.

involuntary stiffness of the ankle. After working with it for a few minutes, and talking with Mr. Phillips to distract him, I was able to get several millimeters of motion in all planes. When I pointed out to him how much better his foot and ankle looked with just this limited amount of therapy, he said "but I can't do that in my cell." I showed him that he can, indeed, put his right leg across his left leg, grab his ankle with his hands, and work it just like I was doing. He says that he will try, and I told him that my nurses were going to be bugging him about doing his therapy regularly. I also demonstrated how to use his walker to better support his ankle while still encouraging weight bearing and ROM.

Id. at 306. In a letter dated December 3, 2009, Dr. Matthews responded to inquiries from Mr. Phillips as follows:

Dear Mr. Phillips:

I received your letter. As we discussed when you were in my office, we typically remove the syndesmotic screw six weeks after the surgery. I can't comment on the symptoms you are having now, as I have not seen you or gotten any other X-rays. If you have been walking on the ankle a fair amount then the screw may already be broken. That is not the end of the world but it is difficult to remove and may give you symptoms if it is broken.

Id. at 319 (emphasis added). On December 11, 2009, Mr. Roberts, the Medical Monitor, entered the following note in his Contact Management folder:

12/11/2009 I have communicated with the mother several times, both by phone and email. The offender has received appropriate care. It is not essential that the screws be removed. The offender has not been following the recommendations of the MD at KCCC to start weight bearing and PT. However, the offender has been in Seg, and his opportunities to exercise and use his ankle are limited. I spoke w/him 12/09, and told him I think that the best thing would be to get him moved ASAP, so that he will be allowed greater movement. The offender has been wait-listed to be transferred out of KCCC. I spoke to Offender Services and this move will be done immediately. I told Offender Services that SCF would be a good choice b/c of their new

PA. The mother has been informed. (note: the offender was moved today, 12/11/09) /dcr

Id. at 287 (emphasis added). As indicated by Mr. Roberts' memo for the file, Mr. Phillips was moved that same day, December 11, to SCF, a state-operated prison, and thereafter was in the care of health care providers other than Dr. Tiona.

X-rays taken at SCF on December 17, 2009, showed "good healing and no loosening of hardware." Id. at 309. The physician's assistant, Kathleen Melloh, noted: "He has not been putting wt on the R foot since that time [August 25] using crutches. Only exercise he has done is drawing the alphabet so consequently he cannot dorsiflex foot past neutral. Plantar flexion is only approx 15 degrees. I did see him in office yesterday and started on ROM exercises, but cannot start any weight-bearing exercises until syndesmotic screw is removed." Id. (emphasis added).

Subsequently, on January 13, 2010, the syndesmotic screw was removed from Mr. Phillips' ankle, intact. The surgeon's notes state that "[s]crew head was cleared and backed out. Wound was closed with Steri-Strips. . . . He can weight bear as tolerated. Ankle was stressed and stable." Id. at 435.

On April 22, 2010, following Mr. Phillips' continuing complaints of pain, he underwent further surgery. After inspection of the prior surgery site, a surgeon removed the right fibular plate (one of the two plates inserted on August 26, 2009), noting:

> The area of swelling that bothered the patient was secondary to muscle impingement over the proximal end of the plate. There was no sign of infection. No sign of necrotic tissue. No tissues, fluid plains or anything noted to suggest infection. All tissue looked healthy. Screws were removed. Plate removed. Where the syndesmotic screw had been we did take a tissue block from that. However, this showed just normal characteristics and no obvious concern of infection. It was felt that the proximal muscle plate interface was what had been irritated.

Id. at 321.

Mr. Phillips constantly complained of pain. At KCCC he demanded the Neurontin that had been prescribed at the El Paso County Jail, but that was denied by Dr. Tiona because it was considered a restricted drug for which Mr. Phillips did not qualify. Dr. Tiona at first prescribed Ibuprofen (to which Mr. Phillips objected because Dr. Matthews initially did not want him to take NSAIDs), then several days later, on October 13, she prescribed large doses of Tylenol and, later, combined doses of Tylenol and Ibuprofen. On October 18, 2009, Mr. Phillips wrote to Dr. Tiona thanking her for the 1000-mg Tylenol prescription. Id. at 463.

With the possible exception of a few days at the El Paso County Jail in September 2009, the record does not show Mr. Phillips receiving anything but Tylenol and Ibuprofen for pain[3] from the date of his surgery on August 26, 2009, through at least 2010. That period includes his incarceration at SCF after December 11, 2009, and two surgical procedures in 2010.

---

[3]The record does disclose the administration of medications related to other conditions; but those prescriptions were not linked to complaints of ankle pain.

During his two months at KCCC, Mr. Phillips refused to put any weight on his right foot, despite advice to the contrary from Dr. Tiona beginning on November 5. As a result, he maintained that the only way he could balance himself on one leg and still access food delivered through the slot in his cell door was to place the food tray on the floor and slide it to the table or bed where he could lift the tray to an eating position. He particularly objected to the tray-sliding technique due to the alleged presence of old dried urine stains on the floor from past occupants. Accordingly, he demanded a wheelchair, to use in his cell, so he could put food trays on his lap.

Likewise, Mr. Phillips demanded a handicap shower facility having grab bars and a fold-down bench. But the one available handicap shower was not working, so he was directed to the regular shower. From October 8 through November 2, 2009, the prison gave Mr. Phillips a plastic chair to assist him in showering. The chair was discontinued on November 2 after Mr. Phillips fell off it. For the next month or so, Mr. Phillips alleges that to undress and dress for his shower, he was forced to sit on the shower floor which he described in lurid detail, not repeated here, as being covered with human wastes of all kinds. He did not complain at the prison and does not assert anywhere in his pleadings that he was unable to shower as such. His complaints are confined to having to dress sitting on a contaminated floor.

Mr. Phillips brought this action alleging that the defendants (1) violated his Eighth Amendment rights by not removing or delaying removal of the syndesmotic screw contrary to Dr. Matthews' treatment plan, resulting in pain and a permanent limp; and (2) violated Titles II and III of the ADA and § 504 by not furnishing a handicap shower or a wheelchair, thus forcing him to sit on a dirty shower floor to dress and to slide his food tray over the dirty cell floor from the door to his bed or table.

The district court, adopting the recommendation of the magistrate judge, dismissed the Eighth Amendment claim against CCA and Warden Brill pursuant to Fed. R. Civ. P. 12(b)(6) and, likewise, the § 504 claim as to all defendants. Subsequently, the court granted summary judgment in favor of the defendants on all remaining claims.

## DISCUSSION

**I.** **Dismissal of Eighth Amendment Claims Against CCA and Warden Brill and § 504 Claims Against All Defendants for Failure to State a Claim Upon Which Relief can be Granted**

We review de novo a district court's dismissal of a complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim, accepting all well-pleaded factual allegations in the complaint as true and drawing all inferences in favor of the plaintiff. Casanova v. Ulibarri, 595 F.3d 1120, 1124-25 (10th Cir. 2010); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007). To survive a Rule 12(b)(6)

motion, the pleadings must contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. We are mindful that Mr. Phillips' pro se status entitles him to a liberal reading of his pleadings; we will not, however, serve as his advocate. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991).

As a preliminary matter, we note that Mr. Phillips states that he appeals the district court's order that dismissed his § 1983 claim as against CCA and Warden Brill and that dismissed his § 504 claim as against all defendants. As best we can understand his opening brief, however, Mr. Phillips does not assert any claim of error other than the dismissal of his § 1983 claim against Warden Brill. Accordingly, to the extent he appeals the dismissal of his § 1983 claim against CCA or the dismissal of his § 504 claim against all defendants, Mr. Phillips has waived appellate review. See United States v. Cooper, 654 F.3d 1104, 1128 (10th Cir. 2011) ("[A]rguments inadequately briefed in the opening brief are waived.") (internal quotation marks omitted).

We have said that a plaintiff cannot establish liability under § 1983 merely by showing that the defendant was in charge of others who may have committed a constitutional violation. Instead, the plaintiff must establish a "deliberate, intentional act by the supervisor to violate constitutional rights." Dodds v. Richardson, 614 F.3d 1185, 1195 (10th Cir. 2010). It is uncertain, however, whether or in what form supervisory liability survives the Supreme Court's

-12-

decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009). See Dodds, 614 F.3d at 1200 ("Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it . . . in ways we do not need to address to resolve this case."); Lewis v. Tripp, 604 F.3d 1221, 1227 n.3 (10th Cir. 2010) (Iqbal "has generated significant debate about the continued vitality and scope of supervisory liability."). At least, under Iqbal, a supervisor's mere knowledge of his subordinate's discriminatory purpose and acquiescence are insufficient to establish a constitutional violation. See Iqbal, 556 U.S. at 677.

In any event, Mr. Phillips cannot meet even our pre-Iqbal standard. He argues that Warden Brill was "dismissed for failure to personally participate, which is not [t]rue." Aplt. Br. at 29. He further claims that Brill denied him the use of a wheelchair and "was personally involved in the medical treatment [Mr. Phillips] was complaining of [and] had the power, as is his duty[,] to abate the pain and suffering." Id.

Mr. Phillips states that he sent "kites" to the warden on October 27, 28 and 29 regarding removal of the syndesmotic screw and requesting transfer to a medical yard. Id. at 9-10. And, he noted that Warden Brill responded on October 30, 2009, by stating that "Dr. Tiona is evaluating your case. You will hear soon." Id. at 10. Such allegations do not state a constitutional violation on the part of the warden. Merely sending grievances to a warden is not enough to attach liability, and the warden's response signified nothing more than a

-13-

reasonable reliance on the judgment of prison medical staff. We agree with another panel of this court which stated that such reliance "<u>negates</u> rather than supports liability." <u>Arocho v. Nafziger</u>, 367 Fed. Appx. 942, 956 (10th Cir. 2010) (unpublished). <u>See also</u> <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (finding that prison official may reasonably rely on the judgment of medical professionals).

We have reviewed the parties' briefs, the record on appeal, and the relevant legal authority, and we agree with the magistrate judge's detailed report and recommendation on this issue. Therefore, with respect to Mr. Phillips' challenges to the dismissal of his § 1983 claim against Warden Brill, we affirm the district court for the reasons stated above and for substantially the same reasons as those set forth by the magistrate judge in her report and recommendation dated March 11, 2011, which the district court adopted in its amended order dated June 9, 2011.


II. **Summary Judgment Dismissing § 1983 Eighth Amendment Medical Treatment Claims Against Dr. Tiona and Ms. Gray**

The district court granted summary judgment to Dr. Tiona and Ms. Gray on Mr. Phillips' Eighth Amendment claims, concluding that those defendants were not deliberately indifferent to Mr. Phillips' condition, and that any disagreement

between them and Mr. Phillips were attributable only to a difference of medical opinion, or, at most, to mere negligence.[4]

## A. Standard of Review

Summary judgment is appropriate in cases where the record discloses "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). In a deliberate indifference case under the Eighth Amendment, we look at the factual record and the reasonable inferences to be drawn from the record in the light most favorable to the non-moving party. Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). The plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." Id. (further quotation omitted). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." Bones v. Honeywell Int'l, Inc., 366 F.3d 869, 875 (10th Cir. 2004). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." Phillips v. Calhoun, 956 F.2d 949, 951 n.3 (10th Cir. 1992); accord Annett v. Univ. of Kan., 371 F.3d 1233, 1237 (10th Cir. 2004) (noting that

---

[4]While there is some confusion in the record, it is clear that in his brief on appeal, Mr. Phillips does not include the question of a wheelchair or a handicap-accessible shower in the Eighth Amendment claims. Rather, his claims are confined to claims under the ADA, and we treat them as such.

"unsupported conclusory allegations . . . do not create a genuine issue of fact")
(further quotation omitted).

### B. Medical Care Claim

Mr. Phillips contends that Dr. Tiona and Ms. Gray violated the Cruel and Unusual Punishments Clause of the Eighth Amendment when they failed to have the syndesmotic screw in his ankle removed during the two months he was at KCCC, i.e. within 3-1/2 months of his surgery. He claims that this failure, and their insistence that he could bear some weight on his right leg after November 5, resulted in his having a permanent limp, and continual pain. As pled, his claims of omission, delay and resulting limp do not cover the additional month between December 11, 2009, when he was transferred to SCF, and January 13, 2010, when the screw was removed, because he firmly asserted in grievances at KCCC that he was going to have a permanent limp if the screw was not removed while he was there. And, according to his allegations, the screw removal in January did not cure his limp.

Prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104-106 (1976). To establish an Eighth Amendment claim under that standard, a prisoner must satisfy two requirements, consisting of an objective and a subjective component. To satisfy the objective component the prisoner must

-16-

establish that the deprivation alleged was sufficiently serious. See Farmer v. Brennan, 511 U.S. 825, 834 (1994). The subjective component requires the prison official to have a "sufficiently culpable state of mind." Id. In the context of prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. (quoting Wilson v. Seiter, 501 U.S. 294, 302-303 (1991)). "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health. . . ." Id. at 837.

A mere difference of opinion between a prisoner and the prison's medical staff with respect to a diagnosis or a plan of treatment, or a mere medical difference of opinion, is not actionable under the Eighth Amendment. See Estelle, 429 U.S. at 107; Self v. Crum, 439 F.3d 1227, 1231 (10th Cir. 2006); Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002); Perkins v. Kan. Dep't of Corr., 165 F.3d 803, 811 (10th Cir. 1999); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980). Applying that rule, the district court concluded that Mr. Phillips failed to satisfy the subjective prong of the deliberate indifference test, that is that Dr. Tiona and Ms. Gray acted with a culpable state of mind. It reasoned that Mr. Phillips' arguments reflected only a disagreement with his post-operative medical care. We agree.

In her affidavit in support of the motion for summary judgment, Dr. Tiona stated that she considered Mr. Phillips' request to have the screw surgically

-17-

removed, but after consulting with the orthopedics department at Denver Health Medical Center (the referring facility used by KCCC), and researching the question, she determined that the screw did not need to be removed during his time at KCCC, i.e., within 3-1/2 months of surgery.

That Dr. Matthews planned to remove the screw around six weeks after surgery, which is his typical practice, does not mean that either removal or removal within six weeks are medical absolutes for all doctors for syndesmotic screws, as Dr. Tiona's affidavit and course of action make clear. Certainly there is no evidence that Dr. Matthews thought that failure to remove the screw within six weeks, or 3-1/2 months, or more, presented an "excessive risk" of harm. In his December 3, 2009, letter to Mr. Phillips (more than three months after surgery), Dr. Matthews stated that "If you have been walking on the ankle a fair amount then the screw may already be broken. That is not the end of the world but it is difficult to remove and may give you symptoms if it is broken." R. Vol. 4 at 319 (emphasis added). Notably, the screw in Mr. Phillips' ankle was intact when removed on January 11; and even if it had not been (as Dr. Tiona envisioned would eventually happen), it would not present a major problem ("That is not the end of the world").

But, Mr. Phillips argues, he limps. At KCCC he insisted he would limp if the screw was not removed at that time. However, there is not one iota of medical evidence linking non-removal of syndesmotic screws within 3-1/2 months

-18-

of surgery to a limp. Not from Dr. Matthews or anyone else. What the record does disclose is that multiple x-rays, and visual examinations during surgery on January 13 and April 22, 2010, showed that the fractured fibula was well healed, that all ankle structures were intact and in place, that there was no problem at the site of the screw, and no necrotic tissue or infection. There was some unrelated irritation discovered in April 2010 around one of the plates.

Absent any medical evidence linking screw removal to a limp, there is no fact question on this subject which could properly be submitted to a jury. More to the point, there is no evidence pointing to a culpable state of mind on this subject where Dr. Tiona is concerned. And, the fact that Mr. Phillips avoided doing prescribed range of motion exercises, including non-weight-bearing ones, until January 2010, or at least December 17, 2009, is significant.

Likewise, there is no medical evidence linking a limp to the fact that Dr. Tiona wanted Mr. Phillips to bear some weight on his right foot after November 5, 2009. Dr. Matthews, who, as one would expect, told Mr. Phillips not to put weight on his foot for the first six weeks after setting and fixing in place a broken fibula, expected that Mr. Phillips would have been "walking a fair amount" by three months after surgery.

The same rationale applies to Mr. Phillips' subjective complaints of pain. He complained continuously of pain: after his surgery, at the El Paso County Jail, at KCCC, and at SCF, and both before and after the removal of the syndesmotic

-19-

screw. But there is nothing in the medical evidence with respect to pain that isolates his two months at KCCC from the standpoint of an excessive risk of serious harm, or knowledge by Dr. Tiona of a substantial risk of harm. As indicated above, what the record does show is a normally healing ankle, with no necrosis or infection, and with no identifiable abnormality in structure, throughout the entire period, excepting only the unrelated tissue irritation around one plate observed in the April 2010 surgery. And, medical professionals at SCF apparently prescribed nothing more for pain than Dr. Tiona prescribed—Tylenol and Ibuprofen—based upon their objective evaluation of Mr. Phillips' ankle and leg.

We have reviewed the parties' briefs, the record on appeal, and the relevant legal authority, and we agree with the magistrate judge's detailed report and recommendation on this issue. Therefore, with respect to Mr. Phillips' challenges to the dismissal of his § 1983 claim against Dr. Tiona and Ms. Gray, we affirm the district court for the reasons stated above and for substantially the same reasons as those set forth by the magistrate judge in her report and recommendation dated November 10, 2012, which the district court adopted in its order dated February 13, 2012.

### III. Summary Judgment Dismissing Phillips' ADA Claims

Mr. Phillips claims that the defendants violated Titles II and III of the ADA by failing to provide him with a wheelchair, primarily to assist him with meals in his cell, and a handicap shower with a bench to aid him in getting dressed. He appeals the district court's dismissal of this claim on summary judgment.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a <u>public entity</u>, or be subjected to discrimination <u>by any such entity</u>." 42 U.S.C. § 12132 (emphasis added).[5] The Act defines a "public entity" as any State or local government, department, agency, special purpose district, <u>or other instrumentality of a State or States or local government</u>; and the National Railroad Passenger Corporation, and any commuter authority. 42 U.S.C. § 12131(1) (emphasis added). <u>See</u> <u>Robertson v. Las Animas Cnty. Sheriff's Dep't</u>, 500 F.3d 1185, 1193 (10th Cir. 2007). An individual is disabled if he has a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

---

[5]The ADA was amended, effective January 1, 2009, by the ADA Amendments Act of 2008 (ADAA), Pub. L. No. 110-325, 122 Stat. 3553, to expand the definition and construction of what constitutes a disability. See 42 U.S.C. § 12102(4)(A). The term "substantially limits" was also broadened, particularly as set forth in EEOC Regulations issued in 2011. See 29 C.F.R. § 1630.2(J)(4) (2012).

The question is whether CCA, a private, for-profit corporation, is an instrumentality of the State of Colorado with respect to KCCC, hence subject to Title II of the ADA as a "public entity." The district court held CCA did not so qualify and granted summary judgment in favor of CCA on the issue.[6]

**A.**

Relevant decisions by the overwhelming majority of courts support the conclusion that the ADA does not apply to private prisons. At least two circuit courts have held, as did the district court, that a private prison is not a public entity under the ADA. See Edison v. Douberly, 604 F.3d 1307 (11th Cir. 2010); Maringo v. Warden, 283 Fed. Appx. 205 (5th Cir. 2008) (unpublished).

The Eleventh Circuit in Edison held that a private prison management corporation, which operated a Florida state prison, was not a public entity subject to Title II of the ADA: "a private corporation is not a public entity merely because it contracts with a public entity to provide some service." Edison, 604 F.3d at 1310. In so concluding, the Eleventh Circuit relied upon the analysis of the Second Circuit in Green v. New York, 465 F.3d 65 (2d Cir. 2006), which,

---

[6]The district court granted summary judgment to defendants Brill, Tiona, and Gray on Mr. Phillips' Title II claim, reasoning that the ADA does not contemplate liability against individuals in their personal capacity, since it is limited to "public entities." Mr. Phillips does not specifically challenge that determination. Accordingly, our analysis is confined to the question of liability against CCA, a corporation.

largely in reliance upon the actual language of the ADA, concluded that a private hospital performing services pursuant to a contract with a municipality was not an instrumentality of the government, and thus not a public entity under the ADA.

The analysis of the Green court is instructive. The court observed that "public entity" under Title II of the ADA is defined as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). Thus, the question became what the statute meant by the term "instrumentality of a State." Green, 465 F. 3d at 78-79. Applying the canon of statutory construction known as *noscitur a sociis* ("a word is known by the company it keeps"), id. at 79 (citing Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961)), the Green court noted that the defining characteristics of the "company" kept by "instrumentality" ("department, agency [and] special purpose district . . . of a State . . . or local government") are that they are traditional government units or are created by a government unit. The Second Circuit concluded that the private hospital in Green was not a governmental unit, but, rather, was a "parallel private entity." Id. Accordingly, as the Edison court, agreeing with Green, concluded: "A private contractor does not . . . become liable under Title II merely by contracting with the State to provide governmental service, essential or otherwise." Edison, 604 F.3d at 1310.

Numerous courts have agreed with this analysis. See Wilkins-Jones v. County of Alameda, 859 F. Supp. 2d 1039, 1048 (N.D. Calif. 2012) (Title II does

not apply to government contractors); <u>Rodrigues v. Arizona Dep't of Corr.</u>, 2012 WL 6200624, at \*\*9-10 (D. Ariz. Dec. 12, 2012) (unpublished) (a private prison does not qualify as an instrumentality of a state and therefore Title II of the ADA does not apply); <u>Rickerson v. Gills</u>, 2012 WL 1004733, at \*2 (N.D. Fla. Feb. 8, 2012) (unpublished) (holding that CCA was not liable under Title II of the ADA); <u>Collazo v. CCA</u>, 2011 WL 6012425, at \*3 (N.D. Ohio Nov. 30, 2011) (unpublished) ("A private prison does not qualify as a department or agency of a state or local government and therefore is not a 'public entity' under the [ADA]."); <u>Medina v. Valdez</u>, 2011 WL 887553, at \*4 (D. Id. March 10, 2011) (unpublished) (analyzing <u>Green</u> and <u>Edison</u> and concluding that "the [ADA] was intended to include only state entities and instrumentalities created by the state. Private contractors do not fit within the strict definition"); <u>Gonzalez-Jarquin v. CCA</u>, 2008 WL 3285764, at \*3 (S.D. Ga. Aug. 8, 2008) (unpublished) ("Although the CCA is contracted with the BOP to operate [the state prison], it does not constitute a 'public entity' within the meaning of Title II."); cf. <u>Maxwell v. South Bend Work Release Ctr.</u>, 787 F. Supp. 2d 819, 822 (N.D. Ind. 2011) (following <u>Edison</u> and <u>Green</u> to hold that a private corporation that employs prisoners is not a public entity); <u>Castle v. Eurofresh, Inc.</u>, 734 F. Supp. 2d 938, 943 (D. Ariz. 2010) (following <u>Green</u> and <u>Edison</u> to hold that a private corporation to whom prison contracts prison labor is not a public entity); <u>Cox v. Jackson</u>, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008 ) (holding that a private company providing

medical services to a prison is not a public entity, stating, "[a] private contractor does not become a 'public entity' under Title II merely by contracting with a governmental entity to provide governmental services").

**B.**

The opposing view is captured in Judge Barkett's dissent in <u>Edison</u>. She argued that the <u>Edison</u> majority "conflate[d] government *contracting* with government *function*." <u>Edison</u>, 604 F.3d at 1311 (Barkett, J., dissenting). While the dissent agreed with the majority that simply contracting with the government does not render a private company subject to Title II of the ADA, it distinguished the facts of <u>Edison</u>, in which a private company "*takes the place of the state* in performing a function within the exclusive province of the state." <u>Id.</u> at 1311-12. In such a situation, the dissent concluded that the "company cannot be permitted to avoid the requirements of the law governing that state function." <u>Id.</u> at 1312. The dissent therefore distinguished <u>Green</u> and other factually similar cases from the situation presented in <u>Edison</u> and in this case: in those cases a private entity only contracted to provide services it was otherwise lawfully able to provide; in <u>Edison</u> and in the case before us, state involvement was essential to perform the function at issue—i.e., operating a prison. <u>Id.</u> at 1311. Nonetheless, that dissent has not found traction in the caselaw on the topic thus far.

The rationale underpinning the Edison dissent finds support in other contexts. In Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 209 (1998), the Supreme Court held that Title II of the ADA applies to state prisons, reasoning that a state prison is unquestionably a public entity and that management of a state prison is one of the primary functions of government. In Smith v. Cochran, 339 F.3d 1205, 1215-16 (10th Cir. 2003), a case involving the rape of a prisoner by a state driver's license examiner, we upheld an Eighth Amendment claim brought under 42 U.S.C. § 1983, reasoning that "persons to whom the state delegates its penological functions, which include the custody and supervision of prisoners, can be held liable for violations of the Eighth Amendment." In reaching that conclusion, we relied on two Supreme Court cases: Evans v. Newton, 582 U.S. 296, 299 (1966) ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State. . . ."); and West v. Atkins, 487 U.S. 42, 57 (1988) (holding that a private doctor treating prisoners under a contract with state prison authorities acted under color of state law for purposes of a § 1983 suit).

We have long assumed that employees of a private prison act under color of state law for purposes of § 1983 suits by inmates, a question left open by the Supreme Court in Richardson v. McKnight, 521 U.S. 399, 413 (1997). See Peoples v. CCA Det. Ctrs., 422 F.3d 1090, 1111, nn. 8, 11 (10th Cir. 2005) (Ebel,

-26-

J., dissenting) (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-42 (1982)); Street v. CCA, 102 F.3d 810, 814 (6th Cir. 1996) (holding that employers of private prison management company were acting under color of state law for § 1983 purposes in that they were performing a "traditional state function."). See also Marsh v. Newton, 134 F.3d 383, 1998 WL 39235, at *4 (10th Cir. Jan. 30, 1998) (unpublished) ("We assume, for purposes of this analysis, that Corrections Corporation of America, the private company operating the women's prison, and its employees, are state actors.").

Perhaps more to the point, several courts have held that under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc-1(a), private prisons qualify as "instrumentalities" of state government. See Knows His Gun v. Montana, 2012 WL 2087226 (D. Mont. Feb. 29, 2012) (unpublished) (citing West v. Atkins, 487 U.S. at 49-51)); Dean v. CCA, 540 F. Supp. 2d 691 (N.D. Miss. 2008); but see Aladimi v. Alvis House/Cope Ctr., 2012 WL 726852 (S.D. Ohio Mar. 6, 2012) (unpublished) (holding to the contrary).

But these lines of reasoning are not without exceptions. Thus, for purposes of the Federal Tort Claims Act (FTCA), a panel of this court has held that the independent contractor exception applies to private prisons, i.e., they are not federal agencies. See, e.g., Menteer v. Applebee, 2006 WL 2294845 (10th Cir. Aug. 10, 2006) (unpublished) (citing Logue v. United States, 412 U.S. 521 (1973)). And the Supreme Court has rejected the proposition that a private prison

management firm is a federal agent for purposes of a prisoner's suit. <u>Minneci v. Pollard</u>, 132 S. Ct. 617, 623 (2012) (characterizing the rejection of a suggestion by the dissent in <u>Correctional Serv. Corp. v. Malesko</u>, 534 U.S. 61 (2001)).

## C.

The question, however, as recognized in the majority of authorities to address Title II and private prisons is not so simple as merely looking generally at function.

### 1. Structure/Function

Structurally, CCA is in no way a public entity. It is a private, for-profit, business corporation, listed on the New York Stock Exchange, in the business of, among other things, the private management of prisons and other correctional facilities under contract with all three federal corrections agencies, sixteen states, and local municipalities. It is the fifth-largest corrections system in the nation behind only the federal government and three states. It houses more than 80,000 inmates in more than 60 facilities, 44 of which are company-owned, and it employs nearly 17,000 people.

CCA operates three correctional facilities in the State of Colorado, under contract with the State: Bent County Correctional Facility, Crowley County Correctional Facility, and, as relevant here, Kit Carson Correctional Center. The State of Colorado contracts with CCA pursuant to state statute authorizing the

CDOC "to permanently place state inmates classified as medium custody and below in private prisons," Colo. Rev. Stat. § 17-1-104.9, subject to legislation comprehensively regulating such prisons.[7]

Functionally, private prisons like KCCC only partly mirror prisons operated by the state.[8] As indicated above, the State of Colorado remains intimately involved. Private prisons in Colorado must, among other things, "abide by operations standards for correctional facilities adopted by the executive director of the department of corrections." Id. at § 17-1-202(1)(e). Notably, inmates assigned to private prisons remain officially in the custody of the CDOC, and the CDOC retains sole authority to assign and transfer inmates, make final determinations on disciplinary matters affecting liberty interests, make decisions that affect sentences or time served, including earned time credits, make recommendations to the state board of parole, develop work requirements, and

---

[7]See, e.g., §§ 17-1-102(7.3), 17-1-103(1)(a), 17-1-103.8(4), 17-1-104.5, 17-1-104.9, 17-1-105, 17-1-105.1 (Accreditation of private contract prisons), 17-1-113.7, 17-1-115.5, and Part 2 of Article I (Department of Corrections): "Corrections Privatization - Requests For Proposals Process." Statutory provisions under Part 2 include 17-1-202 ("Requests for competitive proposals and contract requirements"), 17-1-202.5 ("Private prison planning process"), 17-1-203 ("Powers and duties not delegable to contractor"), 17-1-205 (Contract termination), and 17-1-206 (incorporating the provisions of 16-11-308 regarding inmates in the custody of the CDOC).

[8]The CDOC operates twenty-two state correctional facilities. See Colo. Rev. Stat. §17-1-104.3(1)(b).

determine eligibility for any form of release from a correctional facility. § 17-1-203.

By outsourcing the incarceration of its prisoners, the State relieves itself of significant expenses, from those related to housing prisoners and providing food, medical, dental and other care, plus a full range of programs, to security, and the burden of payroll and state benefits to staff and administrators. In addition the State avoids exposure to the risks and expense of litigation and judgments. CCA personnel have no claim on benefits from the State, and CCA, by statute, indemnifies the State and its employees from all liabilities, including those stemming from civil rights claims; and it must carry insurance to back up that indemnification. Colo. Rev. Stat. § 17-1-202((1)(b).

## 2. Asymmetry

The line separating a State-operated prison from one operated by a private corporation is not just cosmetic. There are important differences, creating a material and significant asymmetry. Thus, for instance, whereas the State and its CDOC employees enjoy Eleventh Amendment immunity from damages suits under § 1983 for their official actions,[9] and CDOC employees in their individual capacities enjoy qualified immunity in § 1983 damages actions, CCA and its private prison employees enjoy neither. They are fully exposed to the numerous civil rights suits brought by inmates. See, Richardson, 521 U.S. at 412

---

[9]See Quern v. Jordan, 440 U.S. 332, 338-40 (1979); Procunier v. Navarette, 434 U.S. 555, 561-62 (1978); Griess v. Colo., 841 F.2d 1042, 1044 (10th Cir. 1988).

("[P]rivate prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case.").  In arriving at that conclusion, the Court in <u>Richardson</u> expressly rejected a functional test, stating:  "Indeed a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery."  <u>Id.</u> at 409.  Of course, the reasoning in <u>Richardson</u> relates to the justification for an immunity, but it is still instructive.  The Court concluded by stating:

> Our examination of history and purpose thus reveals nothing special enough about the job or about its organizational structure that would warrant providing these private prison guards with a governmental immunity.  The job is one that private industry might, or might not, perform; and which history shows private firms did sometimes perform without relevant immunities.  The organizational structure is one subject to the ordinary competitive pressures that normally help private firms adjust their behavior in response to the incentives that tort suits provide–pressures not necessarily present in government departments.

<u>Id.</u> at 412.

On the other hand, unlike federal prisoner suits against government employees, federal prisoners at a privately run federal prison cannot bring a <u>Bivens</u>[10] action against the private corporation that manages the prison, or its privately employed personnel working there, when there is a remedy under state

---

[10]<u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

tort law.  See Malesko, 534 U.S. at 72-73; Minneci, 132 S. Ct. at 620.  But that prohibition is more than offset by the ability to bring actions for simple negligence—a ground not available, for instance, in an Eighth Amendment claim under § 1983.  See Minneci, 132 S. Ct. at 626.  (The "potential existence of an adequate 'alternative, existing process [a tort remedy under state law]' differs dramatically in the two sets of cases.  Prisoners ordinarily cannot bring state-law tort actions against employees of the Federal Government . . . .  But prisoners ordinarily can bring state-law tort actions against employees of a private firm.").

And, with respect to the application of Title II of the ADA, states may, for certain conduct, enjoy sovereign immunity from ADA suits for money damages where that conduct does not actually violate the Fourteenth Amendment.  See United States v. Georgia, 546 U.S. 151, 159 (2006); cf., Guttman v. Khalsa, 669 F.3d 1101, 1118-19 (10th Cir. 2012).  If it is determined that Title II of the ADA applies to them, private prison management corporations will have no such opportunity for protection.

Finally, Title II of the ADA does not apply to federal prisoners in federal prisons, including those privately managed by corporations such as CCA.  That is so because Title II covers only states and defined appendages thereof.

**D.**

Importantly, regulations issued by the Attorney General implementing Title II suggest that states may not avoid the responsibility to provide services to disabled prisoners by contracting away those obligations. Thus, prison assignments should not make a material difference. The regulations require that:

> A public entity in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, [discriminate against individuals with disabilities].

28 C.F.R. § 35.130(b)(1).

Pursuant to that regulation, the State of California, for example, has been required by the courts to ensure that county jails housing state prisoners pursuant to contract do so under ADA-compliant conditions. Armstrong v. Schwarzenegger, 622 F.3d 1058, 1069 (9th Cir. 2010). The court described the contract obligations as follows:

> The State's contracts and arrangements with the counties are not simply to incarcerate parolees and prisoners, but to provide such individuals with various positive opportunities, from educational and treatment programs, to opportunities to contest their incarceration, to the fundamentals of life, such as sustenance, the use of toilet and bathing facilities, and elementary mobility and communication. The restrictions imposed by incarceration mean that all of these positive opportunities must be provided or allowed to individuals incarcerated pursuant to state contracts and arrangements to the same extent that they are provided to all other detainees and prisoners.

Id. at 1068 (emphasis added).

The remedy for violations of the regulation, and such conditions, is not to sue the jails for breach of contract under a third-party beneficiary theory, or for violations of the ADA, but to sue the state for failing to meet its own obligations under the ADA.  Id. at 1069.

The Armstrong case involves a seventeen-year-old ADA class action suit by California prisoners.  Colorado has had a similar ADA class action suit, Montez v. Hickenlooper, No. 92-CV-870-JLK,[11] which resulted in an ADA Remedial Plan for class members, dated August 27, 2003; Administrative Regulation 750-04 governing prisoner requests for accommodation, and the establishment of an ADA Inmate Coordinator and Facility ADA Coordinators.[12]

The record does not disclose what, if any, contract arrangements are in place between CDOC and CCA with respect to the Kit Carson Correctional Center.  But there are strong evidences of ADA policies and practices in place.[13]

_____

[11]The Montez case commenced in 1992 as a pro se civil rights action.  It was subsequently certified as a class action under the ADA.  It ultimately generated the Remedial Plan.

[12]To the extent it may be applicable, certain contracts entered into by the CDOC do not accord third-party beneficiary status to any inmate or to any member of the general public.  Colo. Rev. Stat. 17-1-202(2).

[13]Whether by contract, other operational arrangement with CDOC, or otherwise, it is evident from the record that CCA implements ADA accommodations to some degree.  As Mr. Phillips asserts, the prison had both a handicap shower (not functional) and a cell.  Apparently inmates also had access to a state ADA coordinator and use of state forms and procedures for ADA alerts and requests for accommodation.  See, e.g., R. Vol. 5 at 233 (in responding to an

(continued...)

-34-

Mr. Phillips has not joined the State as a party, so we do not pursue the matter here. The point is, however, that it would be a mistake to assume some stark difference in disability accommodations between Colorado inmates in State-run prisons and those in private facilities operated under contract.

**E.**

In any event, while all these considerations bear somewhat on the problem, in the end we are still faced directly with a question of statutory interpretation: Is CCA a public entity? Is it an instrumentality of government in the same sense

---

[13](...continued)
interrogatory, CCA stated it was "unaware of Plaintiff filing the proper paperwork or going through the required process to be considered for ADA accommodation"); id. at 91, 234 (references to "ADA Inmate Coordinator"); R. Vol. 4 at 427-28(Request for Accommodation: memo from ADA inmate coordinator). There is no indication whether or to what extent CCA complies with CDOC A.R. 750-04.

Furthermore, we note that CCA has been inconsistent in its assertion that the ADA does not apply to it, at least by contract. For example, in CCA's Reply in Support of its Motion to Dismiss, CCA avers that "[T]he ADA is not an official custom or policy of CCA. Rather, the ADA is a legislative act that places certain requirements on CCA." Reply at 4, R. Vol. 1 at 324 (emphasis added); R. Vol. 5 at 248 (CCA responded to an interrogatory asking about "A.D.A. . . . showers" without disputing applicability of the ADA). Mr. Phillips also referred, without apparent objection, to the occurrence of "ADA alerts" at the prison. Id. at 91. Also it is a matter of interest that in the district court CCA did not assert the non-applicability of the ADA in its motion to dismiss but addressed the claim on other grounds. Defendant CCA's Motion to Dismiss, R. Vol. 1 at 204. It waited for the motion for summary judgment to assert that the ADA claim must be dismissed for failing to state a claim upon which relief may be granted. Defendants' Mot. for Summ. J., R. Vol. 4 at 21.

CCA has been unhelpful in explaining its operational practices with respect to ADA accommodations.

as a "department, agency, or special purpose district"? We think not. In the absence of clarification on the point in the 2008 Amendments to the ADA or any of the regulations issued before or since, we agree with the reasoning of the Second Circuit in <u>Green</u> that the proper canon of construction to apply is *noscitur a sociis* (a word is known by the company it keeps), and that "instrumentality" refers to a traditional government unit or one created by a government unit.

Accordingly, we join the Eleventh Circuit and the overwhelming majority of other courts that have spoken directly on the issue, and hold that Title II of the ADA does not generally apply to private corporations that operate prisons. In particular, it does not apply to CCA with respect to the management of KCCC. And the complaint fails to state a claim against CCA upon which relief could be granted for an alleged violation of the ADA.

**F.**

Mr. Phillips also challenges the district court's summary dismissal of his Title III claim, upon recommendation of the magistrate judge, on the basis that the court lacked jurisdiction over the claim. Because Mr. Phillips' sole remedy for a Title III claim is injunctive relief, and he alleged only past exposure to ADA violations, we perceive no error. See 42 U.S.C. § 12188(a)(2); <u>Powell v. Nat'l Bd. of Med. Exam'rs</u>, 364 F.3d 79, 86 (2d Cir. 2004) ("A private individual may

only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages.").

## CONCLUSION

For the reasons stated above, the judgment of the district court dismissing Mr. Phillips' claims is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge