**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 18, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

NANCY MARKS,

      Plaintiff - Appellant,

v.

COLORADO DEPARTMENT OF
CORRECTIONS; COLORADO
DIVISION OF CRIMINAL JUSTICE;
SUSAN KELLER, Community Parole
Office, Colorado Department of
Corrections, in her official capacity; RICK
RAEMISCH, Executive Director Colorado
Department of Corrections, in his official
capacity,

      Defendants - Appellees.

------------------------------

DISABILITY LAW COLORADO;
COLORADO CROSS-DISABILITY
COALITION; DISABILITY RIGHTS
CENTER OF KANSAS; DISABILITY
RIGHTS ADVOCATES; DISABILITY
RIGHTS EDUCATION AND DEFENSE
FUND; AMERICAN CIVIL LIBERTIES
UNION; AMERICAN CIVIL LIBERTIES
UNION OF COLORADO; AMERICAN
CIVIL LIBERTIES UNION OF NEW
MEXICO; AMERICAN CIVIL
LIBERTIES UNION OF UTAH;
AMERICAN CIVIL LIBERTIES UNION
OF KANSAS; AMERICAN CIVIL
LIBERTIES UNION OF OKLAHOMA;
AMERICAN CIVIL LIBERTIES UNION

No. 19-1114
(D.C. No. 1:14-CV-01577-RPM)
(D. Colo.)

OF WYOMING; CIVIL RIGHTS
EDUCATION AND ENFORCEMENT
CENTER,

      Amici Curiae.

_____

**ORDER**
_____

Before **BACHARACH** and **CARSON**,* Circuit Judges.
_____

This matter is before the court on the Appellees' *Petition for Rehearing En Banc* ("Petition"). As an initial matter, we *sua sponte* grant panel rehearing only to the extent of the changes to the original opinion that are reflected in the attached revised opinion. The original opinion is withdrawn and replaced by the attached revised opinion. Because the revised opinion contains only non-substantive changes that do not affect the outcome of this appeal, it shall be filed *nunc pro tunc* to the date the original opinion was filed. Appellees may not file a second or successive rehearing petition. *See* 10th Cir. R. 40.3.

The Petition was transmitted to all judges of the court who are in regular active service. As no member of the panel and no judge in regular active service requested that the court be polled, the request for en banc review is denied. *See* Fed. R. App. P. 35(f).

---

\* The Honorable Monroe G. McKay participated earlier as a panel member, but he passed away before the issuance of this opinion and has not participated in the decision. "The practice of this court permits the remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see* 28 U.S.C. § 46(d) ("A majority of the number of judges authorized to constitute a court or panel thereof . . . shall constitute a quorum.").

The July 14, 2020 *Unopposed Motion for Leave to File Brief of Amici Curiae in Opposition to Petition for Rehearing En Banc* is granted.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

3

FILED
United States Court of Appeals
Tenth Circuit

May 12, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

NANCY MARKS,

     Plaintiff - Appellant,

v.

COLORADO DEPARTMENT OF
CORRECTIONS; COLORADO
DIVISION OF CRIMINAL
JUSTICE; SUSAN KELLER,
Community Parole Office,
Colorado Department of
Corrections, in her official
capacity; RICK RAEMISCH,
Executive Director Colorado
Department of Corrections, in his
official capacity,

     Defendants - Appellees.

_____

DISABILITY LAW
COLORADO; COLORADO
CROSS-DISABILITY
COALITION; DISABILITY
RIGHTS CENTER OF
KANSAS; DISABILITY
RIGHTS ADVOCATES;
DISABILITY RIGHTS
EDUCATION AND DEFENSE
FUND; AMERICAN CIVIL
LIBERTIES UNION;
AMERICAN CIVIL
LIBERTIES UNION OF

Case No. 19-1114

COLORADO; AMERICAN
CIVIL LIBERTIES UNION OF
NEW MEXICO; AMERICAN
CIVIL LIBERTIES UNION OF
UTAH; AMERICAN CIVIL
LIBERTIES UNION OF
KANSAS; AMERICAN CIVIL
LIBERTIES UNION OF
OKLAHOMA; AMERICAN
CIVIL LIBERTIES UNION OF
WYOMING; CIVIL RIGHTS
EDUCATION AND
ENFORCEMENT CENTER,

Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:14-CV-01577-RPM)**

_____

Michael Fairhurst (David Lane, with him on the briefs), Killmer, Lane &
Newman LLP, Denver, Colorado, on behalf of the Plaintiff-Appellant.

Cathern H. Smith, Assistant Attorney General (Philip J. Weiser, Attorney
General for the State of Colorado, with her on the brief), Denver,
Colorado, on behalf of the Defendants-Appellees.

Amy Farr Robertson, Co-Executive Director, Civil Rights Education and
Enforcement Center, Denver, Colorado, and Claudia Center, Senior Staff
Attorney, Disability Rights Program, American Civil Liberties Union, San
Francisco, California, filed an Amici Curiae brief, in support of Appellant.

_____

Before **BACHARACH** and **CARSON**,[*] Circuit Judges.

_____

[*]     The Honorable Monroe G. McKay participated earlier as a panel
member, but he passed away before the issuance of this opinion and has
not participated in the decision. "The practice of this court permits the

_____

**BACHARACH**, Circuit Judge.

_____

Ms. Nancy Marks was serving a prison term in Colorado when she entered a community corrections program operated by Intervention Community Corrections Services. To stay in the program, Ms. Marks needed to remain employed. But while participating in the program, she aggravated a previous disability, and Intervention deemed her unable to work. So Intervention terminated Ms. Marks from the program and returned her to prison. (This is called "regression" to prison.)

Ms. Marks sued, blaming her regression on two Colorado agencies: the Colorado Department of Corrections (CDOC) and the Colorado Department of Criminal Justice (CDCJ).[1] In the suit, Ms. Marks sought damages and prospective relief based on

- violations of the Americans with Disabilities Act and the Rehabilitation Act and

- a denial of equal protection.

---

remaining two panel judges if in agreement to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see* 28 U.S.C. § 46(d) ("A majority of the number of judges authorized to constitute a court or panel thereof . . . shall constitute a quorum.").

[1]  She also sued Intervention and Jefferson County, but the appeal involves only the claims against the CDOC and CDCJ (including official-capacity claims against two CDOC officials). *See* n.3, below.

3

The district court dismissed the claims for prospective relief as moot and granted summary judgment to the CDOC and CDCJ on the remaining claims on grounds that

- the Rehabilitation Act did not apply because Intervention had not received federal funding,

- neither the CDOC nor the CDCJ could incur liability under the Americans with Disabilities Act or Rehabilitation Act for Intervention's decision to regress Ms. Marks, and

- the equal-protection claim failed because Ms. Marks did not show that the regression decision had lacked a rational basis.

We affirm in part and reverse in part. We agree with the district court that (1) the claims for prospective relief were moot and (2) neither the CDOC nor CDCJ violated Ms. Marks's right to equal protection. But we reverse the award of summary judgment on the claims involving the Rehabilitation Act and Americans with Disabilities Act. On these claims, the district court made two errors.

First, the court mistakenly concluded that the Rehabilitation Act didn't apply because Intervention hadn't received federal funding. The court should have considered whether the federal government had funded the CDOC and CDCJ, not Intervention.

Second, the court mistakenly focused on whether the CDOC and CDCJ could incur liability under the Rehabilitation Act and Americans with Disabilities Act for a regression decision unilaterally made by

4

Intervention. This focus reflects a misunderstanding of Ms. Marks's claim and the statutes. The statutes prohibit public and federally funded entities from discriminating against disabled persons in programs like community corrections. These prohibitions apply regardless of whether the entities operate the programs directly or indirectly. So the CDOC and CDCJ could incur liability for disability discrimination by operating the program through Intervention.

1.    **The Colorado Community Corrections System**

In Colorado, local governments operate community corrections programs under state oversight. Colo. Rev. Stat. §§ 17-27-101, 17-27-108(1)–(2) (2013). Colorado provides this oversight through the CDOC and CDCJ, which set standards, administer contracts with local governments and other providers of community corrections, and audit the facilities. *Id.* § 17-27-108(1)–(2). Under state oversight, localities can enter contracts to operate community corrections programs. *Id.* § 17-27-103(1).

With this authority, Jefferson County entered into a contract with CDOC and the Board of Commissioners entered into a contract with the CDCJ. In turn, Jefferson County contracted with Intervention to run the community corrections program where Ms. Marks was placed.

5



The CDCJ contract specified that any subcontractors had to adhere to the CDCJ's standards.[2]

**2.     Aggravation of Ms. Marks's Injury and Her Regression to Prison**

Ms. Marks suffers from spinal stenosis, which limits her ability to walk and requires her to use a wheelchair. While participating in community corrections, she fell in the shower and aggravated her disability.

The incident prompted Ms. Marks's physician to send two letters to Intervention. The first letter described Ms. Marks's injuries, told

---

[2]     State law also required community corrections programs to satisfy the CDCJ's standards. Colo. Rev. Stat. § 17-27-103(4) (2013).

Intervention to place her on complete bedrest for two weeks, and recommended physical therapy. The second letter indicated that Ms. Marks's treatment had been unsuccessful, that she should continue bedrest, and that she was disabled.

Although Ms. Marks alleges that she could have continued working despite her disability, Intervention decided that she couldn't and terminated her from the program:

> Six of the eleven Conditions of Placement require physical activity on the part of the client: one of the more important conditions is that she is employed at a phone location. [Ms.] Marks's medical conditions make it apparent that she will not be able to obtain employment in the foreseeable future, as is required by the ICCS residential program. . . . ICCS has rejected placement after acceptance as her medical conditions no longer make her appropriate to remain in the ICCS residential program.

Appellant's App'x, vol. 2, at 401. Ms. Marks completed her sentence in prison rather than in the community corrections program.

### 3.     Mootness of the Claims for Prospective Relief

In part, Ms. Marks sought

- a declaration that her rights had been violated under Titles II and III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Constitution,

- an injunction against future discrimination, and

- an injunction ordering the CDOC and CDCJ to reasonably accommodate her disability.

7

Appellant's App'x, vol. 1, at 47–49.[3]

The district court dismissed the claims for prospective relief as moot, reasoning that Ms. Marks had completed her sentence. On appeal, Ms. Marks invokes an exception to mootness, arguing that the defendants' conduct was capable of repetition yet evading review.

We engage in de novo review of Ms. Marks's challenge to the determination of mootness. *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). Exercising de novo review, we agree that the claims for prospective relief are moot.

Federal jurisdiction exists only if the court could grant relief affecting the plaintiff's rights. *See Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (noting that courts may not "decide questions that cannot affect the rights of litigants in the case before them" (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971))). The grounds for jurisdiction must exist throughout the litigation, even as circumstances change. *See Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011). When circumstances change and the court can no longer affect the plaintiff's rights, the case ordinarily becomes moot. *Id.*

---

[3] Though Ms. Marks also sued Jefferson County and Intervention, she later stipulated to dismissal of the claims against these parties. *See* n.1, above.

An exception exists when the wrongdoing is "capable of repetition yet evading review." *Ind v. Colo. Dep't of Corrs.*, 801 F.3d 1209, 1215 (10th Cir. 2015). This exception is "narrow" and "only to be used in exceptional situations." *Jordan*, 654 F.3d at 1034–35 (quoting *Chihuahuan Grasslands Alliance v. Kempthorne*, 545 F.3d 884, 892 (10th Cir. 2008), and *McAlpine v. Thompson*, 187 F.3d 1213, 1216 (10th Cir. 1999)). The plaintiff invoking the exception bears the burden of proof. *Id.* at 1035.

To satisfy this burden, Ms. Marks must establish that

- the challenged action ended too quickly to be fully litigated and

- "a reasonable expectation" exists for Ms. Marks to again experience the same misconduct.

*Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).

We assume without deciding that Ms. Marks has proven that her regression ended too quickly to be litigated. Even with this assumption, the exception would not apply because Ms. Marks is unlikely to experience the same wrongdoing in the future. Ms. Marks does not allege that she may return to prison, that she may reenter a community corrections program, or that she may again face regression from a program based on her inability to work. Ms. Marks instead concedes that "the probability of recurrence against [herself] is not high." Appellant's Opening Br. at 63.

9

But Ms. Marks argues that she need not show any possibility of facing the same conduct again. For this argument, she relies on three cases involving abortion, elections, and press access to trials: *Roe v. Wade*, 410 U.S. 113, 125 (1973); *Norman v. Reed*, 502 U.S. 279, 288 (1992); and *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7 (1986).

We disagree with Ms. Marks's characterization of these cases, for they all stress the requirement that the same plaintiff face a risk of encountering the same conduct in the future. In *Roe v. Wade*, for example, the Supreme Court applied the mootness exception because "[p]regnancy often comes more than once *to the same woman*." 410 U.S. at 125 (emphasis added). The Supreme Court also applied the exception in *Norman v. Reed* because "[t]here would [otherwise] be every reason to expect the *same parties* to generate a similar, future controversy." 502 U.S. at 288 (emphasis added). And in *Press-Enterprise Co. v. Superior Court*, the Supreme Court applied the exception because the "*petitioner* [might] be subjected to a similar . . . order" again in the future. 478 U.S. at 6 (emphasis added). None of Ms. Marks's cases imply that plaintiffs can invoke the exception if they face little chance of encountering the same conduct in the future.

Ms. Marks also argues that even though she's unlikely to be regressed again, the case is not moot because the defendants' wrongful

10

policies would continue harming other inmates in community corrections programs. But the mootness exception is not triggered by future risks to others. *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam).

Again, none of Ms. Marks's cases support her proposition. Ms. Marks relies in part on *United States v. Howard*, 429 F.3d 843, 848 (9th Cir. 2005), but she disregards *Howard*'s subsequent history. *Howard* was withdrawn and superseded on rehearing by *United States v. Howard*, 463 F.3d 999 (9th Cir. 2006). The new opinion was also withdrawn. *United States v. Howard*, 480 F.3d 1180 (9th Cir. 2007) (mem.). We decline to follow another circuit court's opinion that was withdrawn.

Ms. Marks also relies on *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009). There the D.C. Circuit concluded that the claims did not become moot because the same plaintiff would likely encounter the same conduct in the future. 570 F.3d at 324–25. *Del Monte Fresh* does not suggest that the mootness exception applies whenever the same conduct could injure others.

Other circuits aside, our cases prevent us from applying the mootness exception based on a risk to others. *See, e.g.*, *White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996) (holding that claims for prospective injunctive relief became moot when the inmate plaintiff obtained parole). Given these

11

cases, we conclude that the claims for prospective relief became moot upon Ms. Marks's completion of her sentence.

## 4. Correctness of the Summary-Judgment Rulings

On summary judgment, the district court ruled that

- the Rehabilitation Act didn't apply because Intervention hadn't received federal funding,

- the CDOC and CDCJ couldn't incur liability under the Americans with Disabilities Act or Rehabilitation Act for Intervention's decision to regress Ms. Marks, and

- the equal-protection claim failed because Ms. Marks had not shown the absence of a rational basis to treat her differently than non-disabled inmates.

### A. Standard of Review

For these rulings, we conduct de novo review, drawing all reasonable inferences favorably to Ms. Marks. *See May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019) (de novo review); *Murphy v. City of Tulsa*, 950 F.3d 641, 643 (10th Cir. 2019) (draw reasonable inferences favorably to non-movant). With these inferences, we consider whether the CDOC and CDCJ have shown the absence of a genuine dispute of material fact and their entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### B. The Applicability of the Rehabilitation Act

The district court rejected Ms. Marks's claim under the Rehabilitation Act in part because Intervention had not received federal funds. We disagree with this ruling because the district court should have

12

focused on whether the CDOC and CDCJ (not Intervention) had received federal funds.

The Rehabilitation Act applies only if the defendant received federal funds. 29 U.S.C. § 794(a) (2012);[4] *see Barnes v. Gorman*, 536 U.S. 181, 184–85 (2002) (stating that "§ 504 of the Rehabilitation Act prohibits discrimination against the disabled by recipients of federal funding, including private organizations").

In district court, the parties agreed that the CDOC and CDCJ had received federal funding. The district court nonetheless concluded sua sponte that the Rehabilitation Act didn't apply because Intervention hadn't received federal funds.

Ms. Marks challenges this ruling, arguing that

- the district court should have focused on whether the CDOC and CDCJ had received federal funds,

- the CDOC and CDCJ were subject to the Rehabilitation Act regardless of whether the federal funds had been used for community corrections, and

- the CDOC and CDCJ admitted in district court that they had received federal funding.

We agree with Ms. Marks. The district court should have considered whether the CDOC and CDCJ had received federal funds. The court had no

---

[4]   This section was amended on July 22, 2014, after Ms. Marks's regression to prison. But this amendment does not affect the outcome.

reason to muddy application of the Rehabilitation Act to the CDOC and CDCJ by focusing on the lack of federal funding to a third party like Intervention. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (observing that to establish a Rehabilitation Act violation, plaintiffs need only show "that *the defendants* receive federal funding" (emphasis added)). Because the CDOC and CDCJ received federal funding, we conclude that the Rehabilitation Act applies.

## C.    Statutory Liability of the CDOC and CDCJ for Discrimination

The district court also reasoned that (1) Intervention had unilaterally decided to regress Ms. Marks and (2) the CDOC and CDCJ could not unravel that decision. For these reasons, the district court concluded that the community corrections program could not be considered a program of the CDOC or CDCJ, preventing liability even if Ms. Marks could satisfy the elements of statutory liability. We disagree.

Under the statutes, the CDOC and CDCJ could incur liability for disability discrimination in their own programs. *See* 42 U.S.C. § 12132 (2012) (prohibiting discrimination against the disabled by a public entity); 29 U.S.C. § 794(a) (2012) (same for discrimination by entities receiving federal funding). The issue here is whether the community corrections program could be considered not only a program of Intervention but also a program of the CDOC and CDCJ. We answer "yes."

14

Ms. Marks was a state prisoner, and the Americans with Disabilities Act and Rehabilitation Act "unambiguously extend[] to state prison inmates." *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 213 (1998) (discussing the Americans with Disabilities Act); *see also Wright v. N.Y. State Dep't of Corrs.*, 831 F.3d 64, 72 (2d Cir. 2016) ("Both the [Americans with Disabilities Act] and the [Rehabilitation Act] undoubtedly apply to state prisons and their prisoners."). The CDOC and CDCJ thus could not discriminate against disabled prisoners participating in the state's community corrections program. *See Castle v. Eurofresh*, 731 F.3d 901, 909 (9th Cir. 2013) (holding that state agencies could incur liability under the Americans with Disabilities Act and Rehabilitation Act when a subcontractor had committed discrimination against disabled prisoners in a program for paid labor and vocational training); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 286 (2d Cir. 2003) (holding that states incurred liability under the Rehabilitation Act for localities' violations because the states' acceptance of federal funds had reflected a promise to ensure statutory compliance).

As long as the CDOC and CDCJ complied with the prohibition against discrimination, they could choose how to operate the community corrections program. For example, the CDOC and CDCJ could operate the program themselves or farm out operations to a local or private entity. But

15

either way, the CDOC and CDCJ would remain subject to the statutory prohibition against discrimination. *See Castle*, 731 F.3d at 910 (stating that the obligations under Title II of the Americans with Disabilities Act "apply to public entities regardless of how those entities chose to provide or operate their programs and benefits").

Because this prohibition applies, the statutes and related regulations do not allow public or federally-funded entities to contract away their liability for discrimination. For example, the Americans with Disabilities Act prohibits discrimination when it is either direct or committed "through contractual, licensing, or other arrangements." 42 U.S.C. § 12182(b)(1)(A) (2012). And the accompanying regulations prohibit public entities from committing disability discrimination either "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 35.130(b) (2013).[5] Similarly, the regulations accompanying the Rehabilitation Act prohibit recipients of federal funding from discriminating against the handicapped "through contractual, licensing, or other arrangements." 28 C.F.R. 42.503(b) (2013).

---

[5] These regulations carry the force of law. *See Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1306 n.1 (10th Cir. 1999) (stating that regulations implementing the Americans with Disabilities Act have the force of law).

16

Under these statutes and related regulations, a state entity's services include programs "undertake[n] through third parties by means of contracts and other arrangements." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir. 2010). The CDOC and CDCJ thus cannot avoid statutory liability solely because they were not directly involved in Intervention's decision to regress Ms. Marks. *See Phillips v. Tiona*, 508 F. App'x 737, 753 (10th Cir. 2013) (unpublished);[6] *see also Armstrong*, 622 F.3d at 1068 (holding that Title II of the Americans with Disabilities Act required state defendants to ensure compliance by private operators).[7]

The CDOC and CDCJ characterize the community corrections program as the exclusive province of Jefferson County and Intervention. But a factfinder could reasonably regard the program as the state's. Indeed, a state regulation assigns administration of residential community

---

[6]   In *Phillips*, we discussed a potential claim against the state for a private prison operator's discrimination against an inmate. 508 F. App'x at 739. We noted that the private nature of the operator should not materially affect liability because the Americans with Disabilities Act's regulations suggest that states can't use contracts to sidestep obligations to disabled inmates. *Id.* at 753.

[7]   The CDOC and CDCJ argue that *Armstrong* is distinguishable because in that case "[t]here was no dispute that the state had the obligation to house the prisoners in the first instance, so it was contracting out its actual authority over those prisoners to third parties." Appellees' Resp. Br. at 23. But the same is true here. Even when Ms. Marks participated in community corrections, the CDOC retained the obligation to house her.

corrections programs to the CDOC. CDOC Admin. Reg. 250-15(I) (2011).[8]

And the CDOC and CDCJ collectively provided funding for community

corrections, made referrals to community corrections,[9] created standards

for community corrections, maintained custody over all inmates in

community corrections, continued to monitor the status of these inmates

while in community corrections, and audited community corrections

programs. Colo. Rev. Stat. §§ 17-27-103(4), 17-27-108(1)–(2) (2013); *see*

*also* Appellant's App'x, vol. 2, at 305–06, 448, 475.[10]

---

[8]    Ms. Marks relied on the 2011 version of the regulation. Appellant's App'x, vol. 2, at 475–80.

[9]    Though the CDOC made the referrals, Intervention could decide whether to accept the inmate into community corrections or regress the inmate to prison.

[10]    The defendants also argue that even if the evidence of state oversight had otherwise sufficed, the claims for damages would fail based on the absence of intentional conduct. Though this argument might ultimately prevail, we cannot address it here.

The parties agree that intentional discrimination is required for a plaintiff to obtain compensatory damages under the Rehabilitation Act or the Americans with Disabilities Act. *See Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) ("To recover compensatory damages under § 504 [of the Rehabilitation Act], a plaintiff must establish that the agency's discrimination was intentional."); *see also Hamer v. City of Trinidad*, 924 F.3d 1093, 1108–09 (10th Cir. 2019) (suggesting that intentional discrimination is required to recover compensatory damages under the Americans with Disabilities Act), *cert. denied sub nom. City of Trinidad v. Hamer*, __ U.S. __, 140 S. Ct. 644 (2019); *Hans v. Bd. of Shawnee Cty. Comm'rs*, 775 F. App'x 953, 956 (10th Cir. 2019) (unpublished) (concluding that intentional discrimination is required to recover compensatory damages under the Americans with



\* \* \*

Disabilities Act). So in the absence of intentional discrimination against Ms. Marks, the parties agree that CDOC and CDCJ would not incur statutory liability for compensatory damages. But the district court didn't decide the issue.

The court did conclude that the CDOC and CDCJ weren't liable for compensatory damages because they couldn't prevent Intervention from regressing Ms. Marks. But that conclusion pertained to the agencies' responsibility for the program—not the existence of intentional conduct.

On appeal, the CDOC and CDCJ conflate the issues involving (1) responsibility for the program with (2) the element of intentional discrimination: "The State Defendants cannot be liable for intentional discrimination against Marks, because the decision to regress Marks from ICCS was made without the authority or consent of the State Defendants." Appellees' Resp. Br. at 17. But responsibility for the program and intentional discrimination are separate issues, and the district court didn't decide whether the CDOC or CDCJ had intentionally discriminated against Ms. Marks. So we express no opinion on whether the existing evidence would create a factual issue on the element of intentional conduct.

19

Federal statutes and regulations prohibited discrimination against prisoners like Ms. Marks when they participated in state programs like community corrections. The CDOC and CDCJ could farm out operations to others, but doing so would not prevent liability under the Americans with Disabilities Act or Rehabilitation Act. So the district court shouldn't have awarded summary judgment to the CDOC or CDCJ on these claims.

### D.    The Equal-Protection Claim

Ms. Marks also appeals the district court's grant of summary judgment on her equal-protection claim, which involves discrimination based on her disability. This ruling was correct.

Under Supreme Court precedent, claims of disability discrimination trigger rational-basis review. *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001). Ms. Marks admits that precedent requires rational-basis review but maintains that disability discrimination should trigger stricter scrutiny. Appellant's Opening Br. at 64 n.24; *see also* Oral Arg. at 30:47 ("What we acknowledged is that under caselaw which we believe is incorrect, it's rational basis review."). But even if we agreed, we could not buck Supreme Court precedent. *See Hutto v. Davis*, 454 U.S. 370, 375 (1982) (per curiam) ("[A] precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be.").

20

Under rational-basis review, the underlying decision is presumed valid. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). This presumption requires us to defer to the decisionmaker's choice whenever we can imagine "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007) (quoting *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1255 (10th Cir. 2005)). Under this standard, states need not "make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367–68 (2001).

The CDOC and CDCJ argue that regression of Ms. Marks was rational because

- her continued housing in community corrections was unsafe because Intervention lacked medical staff and could not provide extended bedrest or medical care and

- Ms. Marks had violated her conditions by failing to attend job training and educational programs or work at a telephone location.

We reach only the first reason and conclude that it satisfies rational-basis review. Intervention lacked on-site medical staff, and the CDOC and CDCJ could reasonably consider the facilities unsafe for Ms. Marks. Indeed, she had already fallen in the shower because of the absence of a grab bar or shower chair. And a physician had said that Ms. Marks's

21

movement was limited, that she needed physical therapy, and that she required bedrest. So even if the CDOC and CDCJ could have prevented the regression decision, they could have rationally doubted Intervention's ability to accommodate Ms. Marks's medical needs. *See Welsh v. City of Tulsa*, 977 F.2d 1415, 1420 (10th Cir. 1992) (holding that a municipal defendant had a rational basis for not hiring a disabled firefighter because of his need for special accommodations).[11]

At oral argument, Ms. Marks contended that she could have been transferred to other community corrections facilities. Oral Arg. at 33:15. But this argument did not appear in the appellate briefs, and we do not consider arguments newly hatched at oral argument. *Hancock v. Trammell*, 798 F.3d 1002, 1017 (10th Cir. 2015).

Concluding that a rational basis existed for the decision to order Ms. Marks's regression, we uphold the award of summary judgment to the CDOC and CDCJ on the equal-protection claim.[12]

---

[11]     Our scrutiny of the equal-protection claim under the rational-basis standard does not bear on whether the regression violated the Americans with Disabilities Act or the Rehabilitation Act. *See Pushkin v. Regents of Univ. of Colo.*, 658 F.2d 1372, 1383 (10th Cir. 1981) (stating that the rationality of an employer's conduct does not prohibit liability under the Rehabilitation Act).

[12]     The CDOC and CDCJ also argue that even if Ms. Marks's equal-protection claim would otherwise succeed, her only remaining remedy—monetary damages—would be unavailable under the Eleventh Amendment. Money damages are unavailable against state officials sued in their official

22

## 5. Conclusion

In our view, the district court correctly

- granted summary judgment to the CDOC and CDCJ on the equal-protection claim and

- dismissed the claims for prospective relief as moot.

But we also conclude that the district court erred in granting summary judgment to the CDOC and CDCJ on the claims under the Rehabilitation Act and Americans with Disabilities Act. The Rehabilitation Act applies because the CDOC and CDCJ received federal funding. And a factfinder could reasonably view the community corrections program as the CDOC and CDCJ's, rendering them liable for the alleged discrimination against Ms. Marks.[13] We thus reverse the entry of summary judgment and remand for further proceedings.

---

capacities. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). But the CDOC and CDCJ raise Eleventh Amendment immunity for the first time on appeal. Given the absence of any such argument below, the district court had no obligation to address the Eleventh Amendment. *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998).

[13]    In district court, the CDOC and CDCJ also argued that they enjoyed Eleventh Amendment immunity on the claims under the Americans with Disabilities Act and Rehabilitation Act. The district court did not reach the Eleventh Amendment issue on these claims, and the CDOC and CDCJ have not briefed the issue here. We thus leave this issue to the district court to decide in the first instance.